BLUEBONNET SAVINGS BANK, F.S.B., Stone Capital, Inc. (formerly known as CFSB Corporation), and James M. Fail, Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 00–5128.

United States Court of Appeals, Federal Circuit.

Sept. 21, 2001.

Rehearing Denied Nov. 20, 2001.

Mitchell R. Berger, Patton Boggs LLP, of Washington, DC, argued for plaintiffs-

appellants. With him on the brief were Michael J. Schaengold, and Ugo Colella. Of counsel on the brief were I. Thomas Bieging, and Catherine M. Grainger, McKenna & Cueno LLP, of Denver, CO.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Jeanne E. Davidson, Deputy Director; Elizabeth M. Hosford, Craig Gottlieb, and Kenneth Dintzer, Trial Attorneys.

Before MAYER, Chief Judge, RADER and LINN, Circuit Judges.

MAYER, Chief Judge.

Bluebonnet Savings Bank, FSB, Stone Capital, Inc. (formerly known as CFSB Corporation), and James M. Fail (collectively "Bluebonnet") appeal the judgments of the United States Court of Federal Claims (1) holding on summary judgment that the passage of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. 101–73, 103 Stat. 183 (1989), and its implementing regulations and related agency actions, breached a contract between Bluebonnet and the government, *Bluebonnet Savings Bank v. United States*, 43 Fed.Cl. 69, 72, 80 (1999) ("*Bluebonnet I*"), but (2) awarding no damages, *Bluebonnet Savings Bank v. United States*, 47 Fed.Cl. 156 (2000) ("*Bluebonnet II*"). We reverse and remand.

## Background

The history and circumstances surrounding the thrift crisis of the early 1980's and the enactment of FIRREA, have been extensively discussed in the original *Winstar* cases and will be revisited only as necessary to the present case. *See United States v. Winstar Corp.*, 518 U.S. 839, 843–858, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*"). The savings and loan industry in the southwestern United States in the late 1980's was in a state of crisis; hundreds of thrifts were either insolvent or on the verge of insolvency, and the Federal Savings and Loan Insurance Corporation ("FSLIC") lacked sufficient funds to liquidate all the troubled thrifts. In response, the Federal Home Loan Bank Board ("FHLBB") approved the "Southwest Plan" on February 3, 1988, to provide government assistance to induce private capital investors to bail out failed savings and loans in the southwestern United States. Under this program, FHLBB grouped insolvent thrifts into packages for sale to investors, and offered a wide variety of incentives, including guaranteed assistance payments, regulatory forbearances, and shared tax benefits. The goal of the Southwest Plan was to attract new capital and management to the thrift industry, eliminate branch redundancies, and reduce the operating expenses of failing thrifts.

James Fail, on behalf of Lifeshares Group, Inc. ("Lifeshares"), an insurance company he owned, and Sidney Steiner, on behalf of the S/D Acquisition Group, entered into a partnership ("the Fail Group") to acquire a group of fifteen insolvent thrifts that eventually became Bluebonnet Savings Bank. The majority of the negotiations between the Fail Group and FSLIC were conducted by Harry T. Carneal, Executive Vice President of Lifeshares, and Robert Roe, an employee of the Southwest Plan Office and FSLIC's main negotiator for the Bluebonnet thrifts. In response to a request by FSLIC that Fail identify the source for a portion of his funding for the acquisition, Fail and Carneal each wrote letters to Stuart Root, Executive Director of FSLIC discussing the plans for capitalization and Fail's commitment to infuse $120 million into the newly formed thrift. The Fail letter was dated December 21,

1988, and the Carneal letter was dated December 22, 1988. Root provided a memorandum to FHLBB recommending that it accept the Fail Group's bid and approve the acquisition on December 22, 1988. That same day, FHLBB approved the Fail Group's bid to acquire Bluebonnet, but conditioned its approval on Fail and CFSB identifying the source of a portion of the funding for the acquisition as recommended by the Corporate and Securities Division ("CASD") of the Office of General Counsel in its review of the proposed bid ("CASD Memo").

Bluebonnet and FSLIC entered into the following agreements: (1) an Assistance Agreement, pursuant to which, Fail and CFSB agreed to recapitalize Bluebonnet by infusing $120 million over a two year period and FSLIC agreed to provide assistance to Bluebonnet that exceeded $3 billion, including FSLIC promissory notes, asset coverage and yield maintenance; (2) a Capital Maintenance Agreement ("CMA") which imposed a number of conditions upon CFSB and Bluebonnet concerning certain ownership and operation issues; (3) a ten-year capital forbearance that allowed Bluebonnet to maintain capital levels lower than those required by regulation but at levels which would increase each year; and (4) a dividend forbearance, which permitted Bluebonnet to pay cash dividends of up to 50% of its net retained earnings beginning December 23, 1989, if it met the capital levels contained within the CMA and if declaring common stock dividends would not cause it to fall below these capital levels. In connection with the CMA, CFSB agreed to purchase and at all times own 100% of the common stock of Bluebonnet, and FSLIC obtained the right to seize Bluebonnet in the event CFSB failed to timely make the capital infusions or to maintain capital compliance.

Pursuant to the Assistance Agreement, Fail and CFSB agreed to recapitalize Bluebonnet by infusing $120 million over a two-year period, with $70 million due the day the Assistance Agreement was signed, and an additional $25 million due on the first and second anniversary dates. The Assistance Agreement required that one-half of the total infusion be raised through the sale of Bluebonnet-issued capital notes and one-half consist of equity. With respect to the initial $70 million, CFSB agreed to infuse $35 million into Bluebonnet through the purchase of Bluebonnet common stock. The remaining $35 million would be infused in the form of subordinated debt issued by Bluebonnet and to be purchased by Lifeshares or one of its affiliates. The Assistance Agreement also required that CFSB purchase $12.5 million of Bluebonnet's common stock on each of the two successive anniversaries of the effective date, while Lifeshares would either purchase or place with an unaffiliated third party $12.5 million of subordinated debt each year.

To meet the initial capital infusions required under the Assistance Agreement, Mutual Security Life Insurance Company ("MSL"), a company owned by Fail, purchased $35 million of subordinated debt issued by Bluebonnet and CFSB purchased $25 million in Bluebonnet common stock funded by a loan in that amount from Bankers Life and Casualty Company ("Bankers Life"), an insurance company affiliated with Robert T. Shaw. Fail's common stock shares in Lifeshares and CFSB were used as collateral for the Bankers Life Loan. The final $10 million was raised on December 30, 1988, when Fail and CFSB entered into a loan agreement with Bankers Life to allow Fail to purchase the remaining $10 million of Bluebonnet common stock. On March 8, 1989, FHLBB issued a technical amendment to its initial approval of the acquisition, which permit-

ted Bluebonnet to treat certain subordinated debt as regulatory capital ("subordinated debt forbearance").

During 1989, considerable efforts were made by Fail to secure capital sources that either were willing to invest in Bluebonnet or to provide financing. He sent John Kirchhofer, a business representative of Steiner, and Carneal to meet with potential capital sources. Kirchhofer focused on finding a "tax-advantaged partner." A tax-advantaged partner is an investor with substantial net earnings capable of utilizing the net operating losses generated by Bluebonnet. Between February and August 1989, Kirchhofer met with three potential tax-advantaged partners and two investment banking firms, but was unable to obtain financing. In early 1989, Carneal met with several New York investment banking firms, in an effort to find investors willing to provide either equity or debt financing, but also was unsuccessful. Fail also utilized accounting firms, consultants, and law firms to help search for candidates willing to provide financing or to be a tax-advantaged partner.

On August 9, 1989, FIRREA was signed into law. FIRREA and its implementing regulations changed the capital requirements applicable to thrifts, imposing core capital, tangible capital, and risk-based capital requirements. The most important of these changes for Bluebonnet was the new requirement to maintain core capital equal to at least 3% of assets. 12 U.S.C. § 1464(t)(2)(A) (Supp. I 1989). FIRREA also altered the then existing regulatory regime, replacing FHLBB and FSLIC with a new agency, the Office of Thrift Supervision ("OTS"). A thrift deposit insurance fund was also created which the Federal Deposit Insurance Corporation ("FDIC") would oversee. Finally, FIRREA prohibited Bluebonnet from treating subordinated debt as regulatory capital,

which decreased Bluebonnet's regulatory capital level by $35 million, the amount of the subordinated debt note issued to MSL. As a result, Bluebonnet's core capital ratio dropped to 2.06% of assets, which failed to comply with FIRREA's new core capital requirement.

Concerned with a threat of seizure and because neither Fail nor CFSB had sufficient funds to infuse capital into Bluebonnet, the Board of Directors of Bluebonnet ("Board of Directors") informed Robert Brick, Caseload Manager of OTS, of FIRREA's impact on Bluebonnet's existing capital structure. After rejecting a series of proposals by the Board of Directors, OTS ultimately approved a plan, which called for Bluebonnet to issue, and CFSB to purchase, $12.5 million of perpetual preferred stock in place of the subordinated debt. On December 21, 1989, CFSB infused $25 million into Bluebonnet which it obtained from Consolidated National Successor Corporation ("CNC"), a holding company owned in part by Shaw. CNC also agreed to refinance the Bankers Life loan. In exchange, CNC obtained, among other things, a right to contingent interest amounting to 9% of the profits of CFSB, together with the right to acquire Bluebonnet, or, alternatively, 50% of the net proceeds of a potential sale of Bluebonnet.

When this infusion proved insufficient to restore capital compliance, Bluebonnet's management took additional steps to adequately capitalize the thrift. These efforts included shrinking Bluebonnet in size by selling approximately $150 million in assets and retaining all of its net earnings to date ($35,221,000) for use as regulatory capital, despite the provision of the Dividend Forbearance, which permitted the distribution of 50% of its net retained earnings on December 23, 1989. As a result of management's efforts, Bluebonnet was able to

achieve capital compliance by December 31, 1989.

Again in 1990, Carneal and Kirchhofer individually met with several potential capital sources. Although some of these investors expressed interest, none chose to finance the 1990 infusion. Throughout May 1990, the Board of Directors sought to declare dividends, but OTS denied these requests, reasoning that Bluebonnet was only marginally compliant with its capital requirements and that there was insufficient evidence to ascertain whether Bluebonnet would remain compliant. On September 12, 1990, the Board of Directors sought approval to declare a common stock dividend of $25 million to CFSB, which CFSB would then use to purchase $12.5 million in common stock and $12.5 million in subordinated debt. OTS denied this request. When on October 30, 1990, the Board of Directors again sought regulatory approval to declare a dividend, OTS officially objected to the Board of Director's notice to declare dividends, and informed them that Bluebonnet could not declare dividends until it provided FDIC with a satisfactory commitment to infuse the remainder of the $120 million in capital and subordinated debt. By the end of November 1990, no new financing had been secured and Fail and CFSB were unable to provide FDIC with a satisfactory commitment. On November 28, 1990, OTS deemed Bluebonnet to be an institution requiring "more than normal supervision," pursuant to OTS Regulatory Bulletin 3a–1. This prohibited Bluebonnet from engaging in certain business activities, including declaring dividends, without first receiving approval from OTS.

With less than one month remaining before the 1990 infusion was due, and with approximately $80 million in outstanding debt to Bankers Life and CNC, Fail and CFSB returned to Shaw for help. On December 12, 1990, Fail and CFSB entered separate loan agreements with Marquette National Life Insurance Company ("Marquette"), a company owned by Shaw, under which Marquette loaned CFSB $25 million for the final infusion and refinanced the 1988 and 1989 loans from Bankers Life and CNC. On that same date, Fail entered the "Stock Acquisition Agreement" with Bluebonnet Interests, Inc. ("BBI"), another company owned by Shaw, which gave BBI the right to seek and obtain regulatory approval to purchase CFSB from Fail by December 11, 1992. The loan agreement with Marquette included a provision that gave it the right to accelerate the due date on the loans to thirty days after it determined BBI would not acquire Bluebonnet. Soon after BBI entered this agreement, Mr. Shaw undertook efforts to acquire Bluebonnet.

On March 28, 1991, OTS downgraded Bluebonnet's classification from a Tier 1 to a Tier 3 institution, which barred Bluebonnet from making any capital distributions without receiving OTS approval. OTS denied all of the Board of Directors' requests in 1991 to declare common stock dividends, and approved only one request to declare a preferred stock dividend of $375,000. On June 5, 1991, Bluebonnet filed suit against the FDIC in the District Court for the Northern District of Texas, seeking a declaratory judgment as to the proper application of the Assistance Agreement, damages, and other relief. Bluebonnet and the FSLIC settled portions of that case, but Bluebonnet reserved its right to bring an action in the Court of Federal Claims for claims of breach "relating to capital forbearances, dividend forbearances, and dividend payments."

In September 1992, Shaw abandoned his efforts to acquire Bluebonnet. Fail and CFSB began negotiations with him concerning the repayment of their outstanding

loans, which amounted to approximately $140 million and were due on December 31, 1992. Shaw and Fail eventually reached a verbal agreement, which they memorialized in an exchange of letters dated October 7, 1992. Shaw, through CNC, agreed that upon Fail and CFSB's reduction of their existing debt to $81 million, CNC would execute long-term loans of not more than that amount to them. In exchange, Fail agreed to give CNC a 50% economic interest in CFSB. At the time, Fail and CFSB did not have sufficient funds to reduce their debt to the required levels. Consequently, Bluebonnet sought an injunction in the District Court for the Northern District of Texas to force OTS to permit, among other things, Bluebonnet to distribute common stock dividends. OTS subsequently rated Bluebonnet as a Tier 1 institution and approved outstanding requests to declare dividends, but required that the funds be used solely to pay down acquisition debt held by Fail and CFSB.

On January 25, 1993, Fail, CFSB, and CNC executed the "Economic Benefits Agreement," ("EBA") which further detailed the agreement discussed by Fail and Shaw in their October 7, 1992 letters. Pursuant to the agreement, CNC reduced the amount of debt held by Fail and CFSB and provided long-term financing for that debt, in exchange for Fail essentially giving CNC a 49% interest in the future profits of CFSB. CNC also obtained the right to receive a percentage of the proceeds from a sale of Bluebonnet. The EBA was amended in 1995 (Amended and Restated Economic Benefits Agreement ("AREBA")) and 1997 (Second Amended and Restated Economic Benefits Agreement ("SAREBA")) without material change.

Bluebonnet ultimately brought suit in the United States Court of Federal Claims against the government for breaching the

contractually assured forbearances by enacting FIRREA. In *Bluebonnet I,* the court determined that the Assistance Agreement, CMA, the FHLBB Resolution, the Fail letter, and the Carneal letter constituted a contract, which it referred to as the "Transaction Agreement." 43 Fed.Cl. at 72, 80. The court also held on summary judgment that the passage of FIRREA and its implementing regulations and related agency actions, breached the CMA, dividend forbearance, and subordinated debt forbearances because the passage of FIRREA fundamentally altered the nature of the transaction, and changed the premises under which Fail had made the deal. *Id.* at 80. Following a trial on the merits, however, the Court of Federal Claims entered judgment for the government because Bluebonnet failed to prove the quantum of damages to a reasonable certainty. This appeal followed.

### Discussion

■ The Tucker Act grants the Court of Federal Claims jurisdiction over actions "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1994). We have jurisdiction under 28 U.S.C. § 1295(a)(3) (1994). The trial court's legal conclusions are reviewed independently. *Hendler v. United States,* 175 F.3d 1374, 1378–79 (Fed.Cir.1999). Findings of fact are subject to the clearly erroneous standard. *Id.* at 1378.

■ The judgment of liability is contested only to the extent that the government argues that any claim under the subordinated debt forbearance is barred by the settlement of the lawsuit in the Northern District of Texas. The Court of Federal

Claims addressed this in *Bluebonnet I.* The settlement agreement's mutual release excepted "all claims of CFSB and Fail to the extent they relate to alleged breaches of contract relating to capital forbearances, dividend forbearances, and dividend payments, or takings arising from any of the foregoing." 43 Fed.Cl. at 79. The court found that Bluebonnet believed that the capital forbearances encompassed the subordinated debt forbearance. *Id.* at 79–80. Given the generic language of the release, we agree that the absence of a definition of "capital forbearance" in the settlement agreement, and Bluebonnet's contemporaneous understanding, the subordinated debt claim was not barred by the settlement agreement.

■ "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981)). A party's expectation interest is the "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a) (1981). Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty. *See* Restatement (Second) of Contracts §§ 347, 351, 352 (1981).

■ The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: " 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.' " *Elec. & Missile Facilities, Inc.*

*v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (Ct.Cl.1969) (quoting *Specialty Assembling & Packing Co. v. United States,* 174 Ct.Cl. 153, 355 F.2d 554, 572 (1966)).

■ Bluebonnet seeks to recover the increase in financing costs caused by the passage of FIRREA which breached the capital, subordinated debt, and dividend forbearances. Bluebonnet argues that the government knew or should have known that Fail and CFSB lacked adequate capital to acquire Bluebonnet and intended to rely on dividends distributed from Bluebonnet to CFSB to help finance the cost of acquisition. The breach of the three forbearances, it argues, increased the risk of the acquisition, making financing harder to find and ultimately more expensive (including additional interest on indebtedness, higher fees paid to lenders, and the cost of the EBA and its successor agreements).

■ Foreseeability is a question of fact reviewed for clear error. *Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.,* 256 F.3d 1365, 1378 (Fed.Cir.2001). The government is not persuasive when it asserts that it was unforeseeable at the time of contract execution that the breach of the forbearances would lead to increased financing costs for Fail and CFSB. The Court of Federal Claims correctly concluded that the dividend forbearance could only plausibly be interpreted as a cash flow guaranty to Fail and CFSB, albeit limited by Bluebonnet's continued compliance with the capital forbearance. There were no restrictions on the use of the dividends by Fail and CFSB and existing regulations allowed debt to be serviced with dividends of up to 50% of the thrift's net income per year (the exact limit in the dividend forbearance). 12 C.F.R. § 574.8(a)(1)(iii)(A) (1989) (effective November 28, 1988, as stated in 53 Fed. Reg.

47941, 47942 (1988)). The court found it "foreseeable under the circumstances that Mr. Fail and CFSB would incur the increased financing costs they now claim without dividends to assist in obtaining additional loans and repaying existing debt." *Bluebonnet II*, 47 Fed.Cl. at 172. It was therefore foreseeable that Fail and CFSB would be forced to find alternate means of financing the required capital infusions when the FSLIC barred the payment of dividends. When the compounding effects of the increased capital requirements of FIRREA and its bar on using subordinated debt as regulatory capital are taken into account, it is forseeable that Fail and CFSB would have been forced to seek even more capital to meet the heightened regulatory requirements. It is also foreseeable that the heightened regulatory requirements and Bluebonnet's risk of seizure due to failure to meet those requirements, would heighten the risk of investing in Bluebonnet and thereby increase the cost of securing either debt or equity financing. We see no clear error in the court's findings that the damages claimed by Bluebonnet were foreseeable at the time the parties entered the contract.

■■■ Causation is also a question of fact reviewed under the clear error standard. *Hendler*, 175 F.3d at 1378. The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive. The government's various arguments regarding alternative causes for the damages lack merit.

Bluebonnet persuasively argues that it would not have entered into the EBA but for the breach and, therefore, it should be entitled to the entire cost of the EBA.

Before entering into the EBA, Bluebonnet made considerable efforts to obtain conventional financing and to acquire a tax-advantaged partner but was unable to do so, in large part, because of the passage of FIRREA and the unfavorable climate it created for investments in thrifts. The government argues that Bluebonnet failed to prove its EBA damages to a reasonable certainty because it did not sufficiently explain the derivation of its EBA-related costs. It is undisputed, however, that CFSB had paid approximately $5.4 million under the EBA. The Court of Federal Claims concluded that Bluebonnet was not entitled to that cost because it failed to establish its but-for the breach hypothetical world. This finding was clearly erroneous, and contradicted the court's explicit finding that the breach, specifically the denial of requests to distribute dividends, adversely affected the terms of the EBA. The EBA, and its grant of a 50 percent equity stake in CFSB to Shaw, was only entered into because the breach removed the dividend distributions as a source of funds for the required capital infusions and made it impossible to obtain long-term financing elsewhere. As a result, Fail and CFSB were repeatedly forced to resort to Shaw and his affiliated companies for short-term financing to meet the various capital infusion requirements and to avert seizure by the OTS. In the absence of the breach, Fail and CFSB would not have agreed to the EBA because dividend financing would have been available and it would have been unnecessary to give up a significant equity stake in CFSB to obtain financing.

■■■ There is sufficient content to the contracts to permit the determination of an appropriate remedy. *Ace–Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed.Cir.2000). "If a reasonable probability of damage can be clearly estab-

lished, uncertainty as to the amount will not preclude recovery," and the court's duty is to "make a fair and reasonable approximation of the damages." *Id.* (quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). It is undisputed that $5.4 million was paid by Fail and CFSB to Shaw under the EBA. In addition, the Memo Account, which purports to document the amounts owed by Fail to Shaw under the SAREBA was presented at trial. Evidence showed that it was a document regularly prepared in the normal course of business and that the amounts owed were agreed to by representatives of Shaw and Fail, whose interests in the amount owed were adverse to each other. However, the Court of Federal Claims improperly rejected the Memo Account as support for the EBA damages because the Deputy Counsel for CFSB was unable to fully explain the basis for all the costs set out in it. This was clear error because the amounts owing under the SAREBA are directly spelled out in that contract and evidence was presented that the Memo Account was prepared in accordance with the SAREBA. This meets the reasonable certainty test and it is inappropriate to require CFSB to justify the basis for each term in the agreement.

It is not the duty of courts to second-guess the terms of a bargained-for exchange. *Aero Spacelines v. United States*, 208 Ct.Cl. 704, 530 F.2d 324, 354 (1976). The trial court determined that, following the breach, Fail and CFSB had no choice but to rely on Shaw for financing, and that it was reasonable to enter into the EBA considering the OTS restrictions on declaring dividends and their use, and the amount of debt already owed to Shaw and CNC. Both parties' experts agreed that costs arising from the EBA are appropriate costs of financing that can be awarded as damages. The Court of Federal Claims needed not to determine *why* the terms of

the EBA and follow-on agreements were what they were, it needed to determine to a reasonable certainty *what* the costs were under those agreements. The EBA represented a bargained-for exchange between Fail and CFSB, on the one hand, and Shaw and CNC, on the other. Once the court determined (1) that the breach caused Fail and CFSB to enter into the EBA, (2) that the increased financing costs reflected in the EBA were due to the increased risk of financing Bluebonnet following the breach, and (3) that it was foreseeable that the breach would cause such increased financing costs, all that was left was to quantify the measure of damages to a reasonable certainty.

We have also allowed so-called "jury verdicts," if there was clear proof of injury and there was no more reliable method for computing damages—but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation. *Elec. and Missile Facilities*, 416 F.2d at 1358 n. 46 (citing *Bell v. United States*, 186 Ct.Cl. 189, 404 F.2d 975 (1968)). "In estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." *Specialty Assembling*, 355 F.2d at 572 (citing *United States v. Smith*, 94 U.S. 214, 219, 12 Ct.Cl. 119, 24 L.Ed. 115 (1876)). In the absence of any more reliable method of determining the quantum of EBA damages, the undisputed $5.4 million payment and the Memo Account memorializing the amounts due and payable under the SAREBA are more than sufficient to provide a "fair and reasonable" basis from which to calculate these EBA-related damages. "[T]he amount of the recovery can only be approximated in the format of a 'jury verdict'

where the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof." *Joseph Pickard's Sons Co. v. United States*, 209 Ct.Cl. 643, 532 F.2d 739, 742 (1976). Even if Bluebonnet had been justifiably unable to substantiate the amount of the EBA damages, it would have been appropriate for the court to award jury verdict damages as a fair and reasonable approximation of EBA damages. This was, in fact, unnecessary, as we have shown, because Bluebonnet adequately substantiated the damages it suffered as a result of entering into the EBA.

However, the Court of Federal Claims properly rejected Bluebonnet's claim for non-EBA damages, even under a "jury verdict" theory. Bluebonnet's non-EBA damage claim was based on the costs of financing in the actual world and a hypothetical but-for world based on assumptions of what should have happened absent the breach. The government argues that Professor Weil, CFSB's expert, assumed a speculative financing term of 13.5% and that CFSB would pay down its debt as quickly as possible. The court correctly noted that there was no evidence presented that anyone would have loaned CFSB the funds required for the capital infusions at 13.5%. The only witness that suggested this rate made that statement contingent on CFSB converting a short-term $35 million loan to long-term financing in advance and there was no evidence presented about the feasibility of that refinancing or the rate that would be available. The Court of Federal Claims correctly found that without long-term financing for this loan, it was highly unlikely that willing investors would have been found for the capital infusions. The court then properly concluded that the evidence was insufficient to determine the quantum of non-EBA damages to a reasonable certainty. We need not address and express no opinion on the court's

alternative grounds for denying an award of non-EBA damages.

### Conclusion

Accordingly, the judgment of the United States Court of Federal Claims is reversed, and the case is remanded with instructions to formulate an appropriate award of EBA-related damages as determined by the payments already made by Fail to Shaw under the EBA, and the value of the EBA debt as calculated in the Memo Agreement.

### COSTS

Costs to appellants.

*REVERSED AND REMANDED.*