**C. Robert SUESS, et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 90–981 C.**

United States Court of Federal Claims.

April 1, 2002.

Don S. Willner, Willner Wren Hill & U'Ren, LLP, Portland, Oregon, for plaintiffs. Thomas M. Buchanan, Winston & Strawn, Washington, D.C., was of counsel.

James J. Igo, Federal Deposit Insurance Corporation, Washington, D.C., for the FDIC as plaintiff in its capacity as Manager of the FSLIC Resolution Fund–RTC and as receiver for and successor in interest to Benjamin Franklin Federal Savings and Loan Association.

Jonathan S. Lawlor, with whom were Jeanne E. Davidson, Deputy Director, and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. Robert E. Leidenheimer, Jr., Melissa B. Rogers, Jacqueline C. Romero, Carl D. Taylor, Jr., and Jonathan B. Taylor, Commercial Litigation Branch, were of counsel.

## *OPINION*

SMITH, Senior Judge.

### BACKGROUND AND PROCEDURAL HISTORY

This case is currently before the court after trial on the question of damages. Plaintiffs are former shareholders of Benja-

min Franklin Federal Savings and Loan Association (Franklin), an Oregon thrift which was seized by government regulators and placed into conservatorship in February 1990. Plaintiffs brought suit in 1990, both individually and derivatively on behalf of Franklin, for the breach of an alleged contract plaintiffs contend Franklin had with government regulators regarding the regulatory treatment of goodwill created from two acquisitions in 1982 and 1985. Plaintiffs contend that, as a result of the breach of the contractual promises regarding the treatment of the goodwill due to the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183, Franklin ultimately fell out of compliance and was seized by government regulators. Plaintiffs sought damages, both individually and on behalf of Franklin, as a result of the alleged breach.

In *Suess v. United States*, 33 Fed.Cl. 89 (1995), the court held that the shareholders could maintain the derivative claim on behalf of the failed thrift, where, as in this case, the shareholders had made an adequate demand upon the receiver to file suit. *Id.* at 96–97.[1] The court dismissed plaintiffs' claims as individual stockholders for lack of standing. *Id.* at 97.

Although the court resolved the issue of the shareholders' right to bring the suit on behalf of the failed thrift, proceedings in this case were stayed while the appellate courts addressed similar contract liability questions and government defenses raised in three earlier filed cases: *Winstar Corp. v. United States* (Case No. 90–8C), *Glendale Fed. Bank v. United States* (No. 90–772C), and *Statesman Savings Holding Corp. v. United States* (90–773C). In *Winstar Corp. v. United States*, the United States Court of Appeals for the Federal Circuit concluded that the thrifts in those three cases had express con-

tracts with government regulators regarding the regulatory treatment of goodwill and certain capital credits. 64 F.3d 1531, 1551 (Fed. Cir.1995)(en banc). The following year, the Supreme Court, in *United States v. Winstar Corp.*, affirmed the judgment of the court and rejected the government defenses based on the sovereign acts doctrine and the unmistakability doctrine. 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

After the decision of the Supreme Court, this court enacted procedures for the coordinated case management of approximately 120 cases, including this one, which appeared to raise similar issues as those raised in the three test cases which had gone to the Supreme Court. As part of the coordinated case management process, plaintiffs were entitled to file streamlined motions for summary judgment in an effort to identify and resolve cases that were most similar to the *Winstar* triumvirate. Many plaintiffs ultimately filed such motions, but it became clear that defendant believed that there were still many issues in individual cases left unresolved by the Federal Circuit and Supreme Court decisions. The court ultimately selected four cases, including *Suess*, which appeared to address many of the common and recurring challenges to liability raised by defendant. The court ordered additional coordinated briefing and heard coordinated argument in the four cases, in an effort to fully ventilate the perceived common issues.

In *California Fed. Bank v. United States*, 39 Fed.Cl. 753 (1997), the court explicitly rejected the arguments raised by defendant in the four cases at bar and held there to be valid and enforceable contracts regarding the capital treatment of goodwill and the other forbearances at issue. Specifically as it regards this case, the court held that Franklin had entered into contracts with government

---

1. Although this ruling has not yet been appealed, the rationale of the trial court in permitting a derivative action was expressly adopted by the United States Court of Appeals for the Federal Circuit in *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed.Cir. 1999). In that case the court cited this court's 1995 opinion in this case and that of a subsequent case, *Slattery v. United States*, 35 Fed.Cl. 180 (1996):

> We agree with the reasoning of *Suess* and *Slattery* and hold that, under the circumstances of this case, the Tucker Act's waiver of sovereign immunity for contract actions can extend to contract actions brought derivatively by shareholders on behalf of the contracting corporation.

*First Hartford*, 194 F.3d at 1293.

regulators in 1982, when it acquired Equitable Federal Savings and Loan Association and in 1985, when it acquired Western Heritage Savings and Loan Association. *Id.* at 776, 779. Based on the reasoning of the opinion, which dealt explicitly with the facts and circumstances of the Franklin acquisitions and the conclusion that Franklin had valid *Winstar*-like contracts with government regulators in both transactions, the court by unpublished order entered summary judgment for plaintiffs and against the government on November 12, 1998.

From January 1999 through July 1999, the court conducted trial on the question of the damages which Franklin suffered from the breach.[2] Plaintiffs are seeking expectancy damages, in the form of lost profits as a result of the breach, as well as restitution in the form of the benefit conferred on the government by entering the contracts. Following trial, the court requested post-trial briefing, including the parties' responses to fourteen particular questions which the court asked them to address. Additionally, following the Federal Circuit decisions in *Glendale Fed. Bank v. United States*, 239 F.3d 1374 (Fed.Cir.2001) and *California Fed. Bank v. United States*, 245 F.3d 1342 (Fed.Cir.2001), the court ordered additional briefing on the effect of these decisions, both of which dealt with damages issues in *Winstar*-related cases. The court has carefully considered the entire trial record, as well as the cogent and organized post-trial briefing, in formulating its conclusions in this case.

## DISCUSSION

### I. THE TRANSACTIONS AT ISSUE

#### A. The Western Heritage Transaction

In 1982, Franklin was a federally chartered mutual savings and loan with assets of approximately $1.6 billion. Equitable Savings and Loan Association was a state chartered stock institution whose deposits were guaranteed by the Federal Savings and Loan Insurance Corporation (FSLIC). The merger of these two institutions resulted in Franklin ultimately adding $342,535,000 of goodwill to its books, which reflected the excess of Equitable's liabilities over its assets on a mark-to-market basis, and which Franklin would amortize over a forty-year period on a straight-line basis. Although the transaction did not involve an Assistance Agreement or include a forbearance letter issued by the Federal Home Loan Bank Board, the court held that Franklin had contracted with the government regarding the regulatory treatment of the goodwill:

> The relevant transaction ... in *Suess*, [Franklin's] acquisition of Equitable, is less explicitly documented than those in either *CalFed* or *Landmark*. However, *Suess* Plaintiffs adequately demonstrate that the intent existed to form a contract concerning the amortization of goodwill. Suess Pl. Mot. Summ J. at 8–12. (citing letters, the Merger Application, independent accountants' opinions, the FHLBB–Seattle's internal "merger digest," and deposition and affidavit testimony of government and [Franklin] negotiators).

*California Fed. Bank*, 39 Fed.Cl. at 776.

Moreover, were the goodwill not includible as regulatory capital, Franklin, which only had approximately $35 million in book capital at the time of the merger, would have been massively insolvent at the moment the merger was effected. In 1986, the agreement regarding the treatment of goodwill was modified by mutual agreement when Franklin converted from a mutual to a stock institution. As part of the negotiation process with federal regulators to gain approval of the conversion, Franklin agreed to reduce the 40–year amortization period to 28 years.[3]

---

**2.** In the first weeks of trial, plaintiffs filed a motion for an order adding the FDIC as an additional plaintiff. Plaintiffs' purpose for doing so was protective, in order to ensure that Franklin could recover a judgment in the event that the court's decision permitting the shareholders to bring this derivative action was reversed. The court granted the ruling from the bench on February 8, 1999. Tr. 1028. The court subsequent-

ly entered an order on April 13, 1999, formally joining the FDIC as a party. Although counsel for the FDIC was present during the trial, and did file additional briefing at the close of trial, its direct participation during trial was minimal.

**3.** Although plaintiffs contended in their initial short-form motion for summary judgment that the amortization schedule had been reduced

### B. The Western Heritage Transaction

In 1985, Franklin acquired Western Heritage Savings and Loan Association, in an assisted transaction in which the FSLIC provided $8.8 million of cash assistance to the merged institution. The transaction resulted in $6.8 million of goodwill to be amortized over the estimated remaining lives of the interest-bearing assets acquired, up to 25 years.[4] The court entered summary judgment for plaintiffs on the question of the existence of a contract regarding the treatment of the supervisory goodwill.[5]

### C. The passage of FIRREA and the seizure of Franklin

In 1989, Congress passed FIRREA. Of particular relevance here, FIRREA required that federally insured thrifts satisfy three new capital standards: tangible capital, core capital and risk-based capital. 12 U.S.C. § 1464(t). Pursuant to the new law supervisory goodwill could not be included at all in satisfying minimum tangible capital requirements, and its use in meeting core capital levels was limited and gradually phased out over five years. The effect of FIRREA on the capital account of Franklin was severe and immediate: with the disallowance of the inclusion of supervisory goodwill, Franklin went from comfortably solvent to instantly insolvent, and it was deficient in its tangible capital account by almost $178 million. The regulatory response to Franklin's plight was exceedingly swift: because Franklin was out of capital compliance on December 7, 1989, the effective date of the new OTS regulations, Franklin was required to submit a capital plan to the OTS. Plaintiffs submitted their capital plan on January 8, 1990. The plan was formally rejected by the OTS on

February 20, 1990, and the thrift was placed into a Resolution Trust Corporation (RTC) conservatorship by the OTS on that same date.

## II. Plaintiffs' Damages Claims

### A. Plaintiffs' claim for expectancy damages

Plaintiffs seek expectancy damages in the amount of $944 million for the profits that Franklin allegedly lost as a result of the breach. It is plaintiffs' contention that the government's breach of the contract forced Franklin out of capital compliance and caused the seizure of the thrift in 1990. In attempting to determine Franklin's lost profits, plaintiffs have developed a model which attempts to determine the profits which a healthy and profitable Franklin would have made had it not been seized. To do so, plaintiffs' expert, Dr. Robert Rogowski, attempted to determine what Franklin's financial picture would have been at the end of 1998 but for the breach. Then, based on the thrifts' projected net income at the end of 1998, Dr. Rogowski hypothesized a "change of control transaction," in which the thrift would be bought, with the purchase price reflecting, presumably, the discounted present value of the bank's future income as of December 31, 1998. In his expert report, Dr. Rogowski analyzed a variety of alternatives to attempt to determine the rate at which Franklin would have grown had it not been seized and how it would have performed absent the breach. Further, Dr. Rogowski analyzed other acquisitions which he deemed comparable to determine the premium which a buyer would be willing to pay at that time for the hypothetical Franklin.

from 40 to 32 years as part of this negotiated agreement, plaintiffs later cite to the 1986 offering circular for Franklin common stock, which indicates that the goodwill is to be amortized over 28 years.

4. The August 12, 1985 forbearance letter actually permitted Franklin to amortize the resulting goodwill from the transaction over a period of 40 years. However, Franklin represented in its offering circular for its sale of common stock in 1986 that it was amortizing its goodwill according to the 25–year schedule.

5. The court also held that Franklin contracted with the government regarding several other forbearances, including a five-year forbearance permitting the exclusion of losses, liabilities and scheduled items attributable to Western Heritage in computing Franklin's minimum capital requirement. The contract also permitted Franklin to book the cash assistance from the FSLIC as a credit to Franklin's net worth. However, although Franklin was entitled to these contractual forbearances, they do not appear to enter into plaintiffs' formulation of damages under either expectancy or restitutionary theory.

In essence, then, plaintiffs have attempted to determine the market value, as determined by the premium Franklin would command in a change of control transaction, that Franklin would have had at the end of 1998 had plaintiff's goodwill contract not been breached. The model obviously requires many inputs, including judgments as to the rate of growth of the institution absent the breach, the net interest margin of the thrift absent the breach, the raising of additional capital absent the breach (which Dr. Rogowski includes in his "most realistic" damage calculation), and the premium which a buyer would pay in a change of control transaction.

A party's expectation interest is "the interest in having the benefit of the bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a) (1981). Such damages "are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (*citing* Restatement (Second) of Contracts §§ 347, 351, 352 (1981)).

It is important to remember, though, that while the standard for awarding expectancy damages is fairly clear, a party seeking damages need not prove them with mathematical precision. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *California Fed. Bank v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001)(quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). Moreover, the court may enter a jury verdict "if there [is] clear proof injury and there [is] no more reliable method for computing damages-but only where the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation." *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1357 (2001)(citing *Electronic and Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 n. 46 (1969)).

Thus, in analyzing Franklin's claim for lost profits, it is important to answer the questions of whether those profits were foreseeable and whether the claimed damages were caused by the breach. But ultimately the critical question is whether Franklin suffered damages as a result of the breach. Assuming foreseeability and causation, if a reasonable probability of damage can clearly be established, then the court is duty-bound to fashion an award that represents a "fair and reasonable approximation." of the damages suffered. Conversely, if there are no damages, then the foreseeability and causation questions are moot.

In this case, the court ultimately concludes that defendant has raised sufficient doubts about the prospective health and profitability of Franklin as a going concern but for the breach that it would be inherently and improperly speculative to award lost profits to Franklin. Moreover, because Dr. Rogowski fails to account for many of these problems facing Franklin in developing his damage model, and because of additional methodological infirmities in the model itself, the court could not use the model to determine Franklin's damages were the court convinced Franklin was actually entitled to lost profits.

Ultimately, two factors are central to the court's determination that Franklin has not proved it would have earned profits absent the breach. The first factor is Franklin's own track record on generating operating income. Although, as plaintiffs stress, Franklin reported 16 consecutive quarters of earnings from June 1985 to June 1989, defendant persuasively demonstrated that the figures were misleading and were not reflective of the economic earnings of the thrift. Rather, a large portion of Franklin's earnings were attributable to gains on the sale of assets and accounting income created from the amortization-of-goodwill/accretion-of-discount mismatch. Defendant showed that Franklin's core earnings-those derived from its net interest margin and fee income from its core business, less operating expenses-were negative in every year of the 1980's. Even during the 1985 to 1989 period, defendant demonstrates that the core earnings

were positive in only four of the 16 quarters.[6] On top of this, by 1989 the supervisory goodwill was already becoming a drag on earnings, and would continue to do so going forward because the accretion of discount was almost exhausted.

This evidence demonstrates conclusively that Franklin had not established a solid record of profitability in the 1980's. Indeed, its core earnings were weak, and the bank faced additional drags on earnings going forward. In addition to the prospect of the earnings drag from the amortization of the supervisory goodwill, Franklin had substantial unrecognized losses in its risk controlled arbitrage portfolio, and apparently a large amount of improperly classified assets on its books which could have further reduced capital when reclassified.

Further, the stock market apparently doubted Franklin's ability to generate earnings. As defendant demonstrated, from December 17, 1986, when the initial public offering for Franklin raised $55 million, until the end of 1988, Franklin's market value declined by more than $20 million. And, as defendant's experts, Dr. Hamm and Professor Fischel, showed, Franklin's stock was the worst performer, both in terms of price and price to earnings ratio, of a peer group of institutions that had been compiled by plaintiffs' own experts.

The only conclusion one can draw from this evidence is that, in economic as opposed to accounting terms, Franklin had no track record of profitability, whether one looks at the entire period of the 1980's or just the four years prior to the enactment of FIRREA. In view of this fact, it would be pure speculation to suggest that, in spite of a demonstrated inability to generate core income in the 1980's, the bank would nonetheless do so in the 1990's.[7]

Buttressing the court's conclusion about the profitability of Franklin is the second critical factor undermining an award of lost profits: Franklin's precarious capital position even were goodwill to be included in regulatory capital. Indeed, according to Dale Weight, Franklin's President and CEO, Franklin would not have met its risk-based capital requirement even with the goodwill, although the record suggests they would have been able to get into compliance rather easily if the goodwill were included in regulatory capital. And, as defendant points out, this scenario was overly optimistic because Franklin's January 1990 Capital Plan failed to account for the asset revaluations which would have diminished the thrift's capital. Dr. Hamm provided credible evidence showing that, regardless of whether one reduced capital based on the revaluation of troubled assets, Franklin's position was very weak, and Dr. Hamm projected that, by 1992, Franklin would be capitally deficient in core, tangible and risk-based capital, even under Franklin's best-case scenario.

In view of these facts, Franklin could take remedial action to improve its capital position, either by raising capital, shrinking, or improving earnings. While the court believes that it would have been possible for Franklin, in spite of these problems, to work with regulators to improve its capital position, either through raising capital, shrinking, demonstrably improving earnings, or some combination of the three, there is little question that Franklin was not in a solid capital position even with the goodwill on its books counting as regulatory capital.

The evidence is overwhelming that Franklin had no demonstrated history of generat-

---

6. The evidence also showed that Franklin during the 1985 to 1989 period reported gains on sale of more than $110 million. While there is some dispute about whether gains on sale from mortgage banking activities should be included in core earnings, the evidence showed that the amount of gain on sale attributable to mortgage banking activities was small ($763,000 between 1985 and 1989) and does not alter the conclusion that gains on sale accounted for a significant portion of Franklin's income.

7. This conclusion does not mean that plaintiff could not or would not become profitable in the 1990's. It is entirely possible that Franklin, were it able to survive, could have turned the corner and become a consistently profitable institution. However, what the record evidence shows is that it would require the bank to turn a corner rather than stay a course to do so. In view of that, it is clearly speculative to premise lost profits on a corner that might or might not be turned in the future.

ing core earnings and was in a very precarious capital position when FIRREA became law. As a result, plaintiffs not only fail to prove their lost profits damages with reasonable certainty, they fail the initial test of whether there is a reasonable probability that the bank suffered damages in the form of lost profits.

Because these problems fundamentally undermine plaintiffs' claim for lost profits, the court need not spend much time critiquing the damage model constructed by Dr. Rogowski. However, it does bear mentioning that Dr. Rogowski's model, while ignoring the above problems, also makes some assumptions which are fundamentally implausible and render the model overly speculative. Four in particular stand out to the court. First, the use of Washington Mutual's net interest margin as a proxy for that of the 1998 hypothetical Franklin-a critical input which radically affects the damage number-is simply unrealistic. As Dr. Hamm persuasively testified, the two thrifts-even when comparing Washington Mutual to the hypothetical rather than real Franklin—are not in any way comparable. Second, Dr. Rogowski fails to account for Franklin's historical underperformance in the 1980's compared to its peer group based on its return on assets and return on equity, in determining the growth rate of the hypothetical Franklin in the 1990's. Third, Dr. Rogowski's self-described best valuation (and the foundation of his ultimate damage figure) uses the 1990 Capital Plan as the "base" for the inquiry (with additional inputs by Franklin management). As defendant correctly points out, Dr. Rogowski never did any testing to determine Franklin's ability to meet its business plans in the past, which is critical in determining the legitimacy of relying on the Capital Plan in formulating the damage model. (Defendant showed definitively Franklin's inability to meet prior business plan objectives throughout the 1980's.) In addition to the general inability of Franklin to meet goals contained in their business plans, James Caton, the OTS regulator who reviewed the Capital Plan in 1990, testified that Franklin's projections in the Capital Plan for increases in net income and ROA were simply not realistic.

Lastly, Dr. Rogowski's last and best estimate of Franklin's lost profits is $944 million, based on the change in control price in 1998. Thus, the model contemplates that the value of Franklin-a thrift with core income problems, capital woes, and a stagnant and at times declining stock price for the entire period the thrift was publicly traded-would see its value increase by a multiple of nearly 27 from 1990 to 1998. As Dr. Hamm points out, this would make Franklin's stock one of the top 50 best performing stocks in any industry over that period. By comparison, a $100 investment in Franklin's stock on June 30, 1989 would have risen to a value of $2400 by the middle of 1997, while a similar investment in the S & P 500 index would only have risen in value to $275. Dr. Hamm also testified that Franklin's hypothetical performance outperforms the thrift industry "by a quantum amount." It is also, importantly, completely at odds with Franklin's own historical performance.

The fact is that plaintiffs' damage model is premised on unrealistic assumptions and produces an absurdly high damage figure that bears almost no relation to Franklin as a going concern. The alleged damages are all the more ridiculous when one considers the fundamental problems that Franklin faced irrespective of the capital status of its goodwill, and its continuing struggles to generate core earnings. Indeed, Franklin has failed to show that it is entitled to any damages in the form of lost profits, much less nearly $1 billion for a thrift worth $35 million at the time of breach.

Because the court has disposed of plaintiffs' lost profits claim because plaintiffs cannot show that they suffered damages in the form of lost profits, the court has no need to address the other two prongs of an expectancy claim: foreseeability and causation. The court will now turn to the restitution claim of plaintiffs.

### B. Plaintiff's claim for restitution

Plaintiffs seek restitution on behalf of Franklin in the amount of $1.168 billion. The alleged restitution request has several components. First, plaintiffs seek restitution

measured by the amount of the excess liabilities assumed by Franklin in its acquisitions of Equitable and Western Heritage, which plaintiffs estimate to be $351.2 million, plus an additional $10 million, which represents the cash which Franklin had to pay to Equitable shareholders at the time of that acquisition. Second, plaintiffs seek the value of the earnings on the money they allege was saved by the FSLIC fund, because the fund could allegedly invest those saved monies rather than liquidate Equitable and Western Heritage. Plaintiffs estimate that amount to be $526.3 million. Third, plaintiffs seek the franchise value of Franklin at the time of seizure, which they peg at $341 million, less the value of the benefits which Franklin received, which plaintiffs estimate to be $60 million, for a net franchise value of $281 million.

▪ Restitution is designed "to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1380 (Fed.Cir. 2001). In *Glendale*, the court addressed the issue of an award of damages in a case involving a supervisory goodwill contract based on the value of the assumed liabilities. *Id.* at 1381. The trial court had measured restitution based on the value of the benefit conferred to government as part of the goodwill contract. *Glendale Fed. Bank v. United States*, 43 Fed.Cl. 390, 406 (1999). The largest component of the restitution award was the net dollar value of the excess liabilities assumed by Glendale at the time of the transaction. *Id.* at 407. The Federal Circuit reversed the award of damages based on the dollar value of the liabilities assumed:

> This case, then, presents an illustration of the problem in granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, mea-

sured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld; accordingly we vacate the trial court's damage award on this theory.

*Glendale,* 239 F.3d at 1382. This holding bars the court from using the market value of the assumed liabilities as the baseline for determining restitution. There is no record evidence in this case to indicate that supposed gains were less "speculative and indeterminate" than they were in *Glendale,* and the logic underpinning both the claim in *Glendale* and the claim here is identical. Moreover, the holding implicitly would bar the claim for interest earned on the saved funds, since that figure is premised on the mark to market value of the excess liabilities.[8]

▪ The remaining components of plaintiffs' restitution claim on behalf of Franklin not presumptively barred by the Federal Circuit's *Glendale* opinion are the $10 million payment made to Equitable shareholders in 1982 as part of the acquisition and the $281 million net value of the seized bank. The court finds it difficult to understand how the $10 million payment to Equitable shareholders can be considered a part of a proper restitution award. While the court has no doubt that the $10 million was necessary to induce Equitable to merge with Franklin, the court does not see how this cost benefitted the government. If anything, the payment actually exposed the insurance fund to greater contingent risk because it depleted the amount of cash standing between Franklin and the insurance fund. In reality, it was a cost of the transaction between Franklin and Equitable. (Indeed, for the reason mentioned above, the payment likely made the takeover slightly less attractive to regulators.)

The larger remaining portion of plaintiffs' claimed restitution is the net value of Franklin when it was seized by regulators in February 1990, or $351 million, less the $60

---

8. Although not addressed squarely in the Federal Circuit's opinion, the Court of Federal Claims had disallowed the portion of Glendale's restitution claim which was based on the earnings generated from the FSLIC funds saved by avoiding liquidation, on the ground that these damages amounted to unjust enrichment and were not recoverable in contract. *Glendale,* 43 Fed.Cl. at 407–08.

million of that value which Dr. Rogowski attributed to the value that Equitable and Western Heritage contributed to the franchise. The franchise value includes the following elements: $162.3 million, which represents the premium which plaintiffs claim Bank of America paid for the franchise; $27 million for the real value of servicing rights which Bank of America purchased for $13 million; $110 million, which plaintiffs claim is the market value of the remaining goodwill on Franklin's books; and $41 million, which is the premium Bank of America would have paid for the $600 million in deposits which ran off between the seizure of Franklin and Bank of America's purchase of the Franklin assets.

When viewed as a whole, the franchise value that plaintiffs attach to Franklin is plainly unrealistic. Plaintiffs would have the court believe that Bank of America was willing to pay $351 million for Franklin (including Mr. Murphy's valuation of the goodwill on the open market at $110 million). However, Bank of America could have purchased Franklin, even assuming a substantial change of control premium of double the market value of all Franklin common stock, for less than a quarter of that price. It is economically illogical for a sophisticated buyer like Bank of America to so overpay for Franklin.

The answer, then, is that Bank of America did not purchase Franklin, but only those portions which they wanted. Moreover, Mr. Murphy's calculation of the value of the supervisory goodwill at $110 million is plainly overstated. As defendant's witness Dr. Frankel points out, the kind of forbearance which goodwill represents would have no economic value to a well-capitalized bank like Bank of America. Further, as Dr. Frankel testified, it would cost Bank of America only $17.1 million to raise $285 million in real capital, which, unlike goodwill, could be used to invest in real interest earning assets and would not be a drag on earnings like goodwill. The figure of $110 million, unsupported by any evidence other than Mr. Murphy's summary valuation, is, at best, implausible.

Because so much of the claimed value of the thrift is unsupported in the record, the court need not determine whether the value

of the deposit run-off after the seizure and the alleged real economic value of the servicing rights are accurately tabulated, because the underlying valuation plaintiffs ascribe to the thrift is clearly overstated. Because these are merely small components of the plaintiffs overall and fundamentally flawed valuation, they are of no use in ascertaining a franchise value even if plaintiffs' calculations are accurate.

## C. The court's alternative approach to damages

■ Faced with a flawed and implausible damages model and a legally barred restitution model, the court believes that Franklin is nonetheless entitled to damages for the breach of the contract. Specifically, the contract regarding the treatment of goodwill can be understood in part as a promise by regulators to protect the institution from regulatory insolvency for an extended period. While the transactions clearly were designed to buy time for interest rates to come down, they were also designed to protect the viability of the acquiring thrift so that it would not be pulled under water by the net worth deficits of the acquired firms. Clearly then, it was both foreseeable and actually foreseen that a breach of this commitment could very well devastate the non-breaching party and put its own economic net worth at risk.

That is exactly what happened in this case. Franklin and its shareholders pledged their net worth in exchange for this regulatory accounting treatment. It is also indisputable that FIRREA rendered the thrift massively capital deficient instantly. While it is certainly true that plaintiffs would have been teetering on the brink of non-compliance even with the goodwill includible as regulatory capital, there is no argument that the breach rendered Franklin massively insolvent and in immediate distress, which would not have been the case had the goodwill been recognized. Although defendant did present evidence of Franklin's obvious capital problems regardless of the treatment of the goodwill, there is also ample evidence on the record from officers of Franklin that the problems could have been managed had Franklin had the capital cushion that good-

will provided. The court thus holds that the breaching provisions of FIRREA were the "substantial factor" leading to the demise of Franklin, and sufficient to establish the causation element of damages based on the lost value of the Franklin franchise. *See Bluebonnet,* 266 F.3d at 1356.

The court thus must value what was lost by the seizure of the thrift. Plaintiffs' valuation in the restitution context is plainly too high. However, the clearest indicator of the value of Franklin prior to the breach was the market value of Franklin's stock on the day prior to the breach, which is approximately $35 million. This amount establishes how the market valued future income of Franklin discounted to present value, and it presumably incorporates the value the market assigned to goodwill which remained on Franklin's books at the time of the breach. Indeed, defendant's own experts, Professors Miller and Fischel, ratify this approach to ascertaining Franklin's damages.[9]

The argument is made that the conservator, and ultimately the receiver representing the interests of Franklin, has fairly obtained the value of the thrift through the disposition of the thrifts' assets. And it is true that the Franklin receivership had a surplus of $73 million at the end 1998. The problem, however, is that the receivership faces a tax claim relating to alleged federal financial assistance received by Franklin that dwarfs the receivership surplus.[10] While one can argue whether the receivership has done a good job

or not in representing the interests of Franklin, it cannot be disputed that Franklin had a value of $35 million in 1989 prior to FIRREA and its successor, the Franklin receivership, had an effective value of $0 in 1998 when one accounts for the $740 million tax assessment. Shareholders had $35 million in 1989 and they have nothing today. It is therefore reasonable to assume that the $35 million which has disappeared-the going concern value of Franklin prior to FIRREA-was extinguished by the breach and the seizure caused by the breach.

Accordingly, the court believes that the evidence in the record shows that a fair and reasonable approximation of Franklin's damages accounts for the lost equity value of the institution which was extinguished upon the seizure caused by the government's breach. These are classic contract damages, because it is was both foreseeable and actually foreseen that breach of the contractual promise regarding the regulatory treatment of goodwill would push the thrift into insolvency and subject it to seizure. Further, the breach was the substantial factor in the seizure of Franklin. In short, but for the breach, Franklin would have been a going concern with a market value of $35 million. Because of the breach its equity value is now effectively zero. Based on the evidence in the record, Franklin's market capitalization on the day prior to breach was approximately $35 million, and this is the proper award of damages.[11]

9. The Miller and Fischel expert report states that the damages "can not exceed" the market value of the thrift at the time of the breach, assuming legal causation. Professors Miller and Fischel also note that any recovery of the plaintiffs from the receivership surplus would be offset against these damages.

10. According to the parties, as of December 31, 1998, the IRS tax assessment (which is disputed by the plaintiffs and the FDIC) is $741.8 million, comprised of $95.9 million in taxes, $444.7 million in interest, and $201.2 million in penalties.

11. As mentioned above, the court ordered additional briefing after the Federal Circuit decisions in *Glendale* and *California Federal* were handed down. The court has, of course considered the parties' briefing in developing this decision. Although not addressed in the corpus of the opinion, there are three points raised in the briefing upon which the court should comment.

First, plaintiffs raised the possibility of having the court use a reliance theory to analyze and award damages, given that the Federal Circuit articulated its preference for a reliance analysis for the award of damages in *Glendale. See Glendale* 239 F.3d at 1383. ("[R]eliance damages provide a firmer and more rational basis than the alternative theories argued by the parties.") There are two problems with this argument, one procedural and one methodological. First, defendant has demonstrated that plaintiffs repeatedly foreswore pursuing reliance damages in this case. Second, even were the court to consider the request to be a motion pursuant to RCFC 15(b) for an amendment to conform the evidence "when the issues not raised in the pleading are tried by express or implied consent," the body of plaintiffs' belated reliance claim-based on plaintiffs' calculation of the value of the assumption of liabilities of Equitable and Western Heritage and the value of the seized

The court understands, of course, that the award of approximately $35 million for the value of a franchise seized 12 years ago provides Franklin with far less in economic terms than it is owed. While the court is limited by the prohibition on pre-judgment interest in this case, the court believes that the award is grossly inadequate in view of the damages actually suffered by Franklin. This, of course, is a recurring problem in the *Winstar*-related cases, because parties who are harmed, even when able to prove damages in these difficult and novel cases, will not be made fully whole. Indeed, it is ironic that Franklin is prevented under the law from being made whole because it cannot obtain interest on its damages caused by the government's breach, but the government itself claims massive interest assessments against Franklin on the tax it contends the Franklin receivership owes.

Unfortunately, the courts, at least at this juncture, are not the fora that can make the damaged parties whole. This represents one of those gaps in our Nation's system of the rule of law. Our great Constitution's Framers were men of extraordinary vision. They understood that while a framework for the protection of rights under law had´been established in 1789, its complete fulfillment was an ongoing project for the ages. Through statute and executive action our Nation has moved toward that goal. This is a case where the movement should continue through the legislative process.

## CONCLUSION

Based on the foregoing, the court denies the lost profits and restitution claims of plaintiffs in their entirety. However, the court believes that Franklin is entitled to

recover the lost franchise value of the thrift, which the court concludes is the most fair and reasonable approximation of the real economic harm to Franklin (in 1990 dollars). Therefore, Franklin is entitled to damages equal to the market capitalization of Franklin on the last business day prior to the enactment of FIRREA. Although this amount has been referenced in the record as $35 million, the parties are directed to file a stipulation within 21 days of the date of this opinion as to the amount. The court will then enter judgment in that amount for Franklin.

**IT IS SO ORDERED.**

thrift-is no different than the basis of the restitution claim and is therefore equally flawed.

Second, the FDIC raised the possibility that contract damages could be ascertained by determining the value of the goodwill which was extinguished by the breach. Although the only evidence in the record as to the value of the goodwill is Mr. Murphy's testimony, which the court does not find persuasive, the court nonetheless agrees with the FDIC that using a traditional damages approach is most appropriate in this instance.

Third, defendant has objected, in the context of challenging the FDIC's suggestion on calculating

damages, to an award of cover damages, on the ground that it is a damages remedy, and is therefore subject to different legal requirements than restitution. However, in the context of viewing the value of the seized institution as the basis of the damage award, the record has demonstrated that the legal requirements for damages have been clearly met, and that defendant has had an ample opportunity to challenge the elements of such an award within the context of addressing plaintiffs' lost profits and restitution theories. Moreover, the court's theory of damages comports nicely with the analysis and conclusions of Professors Miller and Fischel.