# United States Court of Appeals for the Federal Circuit

2006-5128, -5129

FIFTH THIRD BANK,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Jerrold J. Ganzfried, Howrey LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Alan M. Grimaldi, and Jennifer R. Bagosy, of Irvine, California. Of counsel on the brief were Robert M. Bruskin, of Washington, DC, and James Hubbard, Fifth Third Bank, of Cincinnati, Ohio.

David A. Levitt, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Kenneth M. Dintzer, Assistant Director, and Arlene Pianko Groner, John H. Roberson, and John J. Todor, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

2006-5128, -5129

FIFTH THIRD BANK,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 95-CV-503, Judge Christine O.C. Miller.

_____

DECIDED:  March 10, 2008

_____

Before BRYSON, <u>Circuit Judge</u>, PLAGER, <u>Senior Circuit Judge</u>, and KEELEY, <u>Chief District Judge</u>.[*]

PLAGER, <u>Senior Circuit Judge</u>.

This is another <u>Winstar</u>-related case, in which a banking institution alleges that it was financially injured, wrongfully, by actions of the United States Government and its regulatory agencies.  This particular case has a long history, resulting thus far in eight published opinions by the trial court and an earlier one by this court.  The full details of the proceedings to this point can be found in the trial court's most recent opinion.[1]  In

---

[*]    Honorable Irene M. Keeley, Chief Judge, United States District Court for the Northern District of West Virginia, sitting by designation.

[1]    <u>Fifth Third Bank v. United States</u>, 71 Fed. Cl. 56 (2006) ("<u>Fifth Third IX</u>").

the interest of judicial economy we will not repeat that detail here, but summarize it as necessary for this opinion.

Fifth Third Bank ("Fifth Third"), then Fifth Third Bank of Western Ohio, filed its original complaint against the United States ("Government") in 1995. Fifth Third acquired and is the successor to Citizens Federal Bank FSB ("Citizens"), the financial institution that actually suffered the alleged losses. For purposes of clarity we will refer to Citizens when it is necessary; otherwise we will refer to the plaintiff as Fifth Third.[2]

Fifth Third sought damages from the Government for breach of contract related to the savings and loan debacle arising out of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"). FIRREA negatively affected the way certain financial institutions could utilize what was called 'supervisory goodwill,' an accounting method that earlier had been promised to them by federal regulators who sought their help in salvaging failing savings and loan institutions ("S&Ls") in the 1980s. FIRREA caused these rescuing and once-healthy S&Ls to suffer significant losses, for which the United States Government was eventually held liable.

Since this court's 1995 opinion in Winstar Corp. v. United States,[3] affirmed by the Supreme Court,[4] these injured financial institutions have sought damages for the

---

[2] For the reader curious about how a bank came to be called Fifth Third, the origins go back to 1863 when the Third National Bank was organized in Ohio. In 1888 the Queen City National Bank of Cincinnati was renamed the Fifth National Bank. These two merged in 1908 to become the Fifth Third National Bank of Cincinnati. The extensive history of the bank's changes in name and size through mergers and acquisitions, of which its acquisition of Citizens Bank is a part, is detailed on the bank's website at www.53.com. Today, Fifth Third Bank is owned by Fifth Third Financial Corporation which is owned by Fifth Third Bancorp (both Ohio corporations).

[3] 64 F.3d 1531 (Fed. Cir. 1995) (en banc).

losses; the Government's litigators have doggedly fought them every step of the way. This court has been called upon to issue a number of opinions further defining the terms of the Government's liability and settling the theories underlying and the scope of the issues for which damages were to be paid. This case is one more in that long-running tail,[5] and the Government again insists on challenging virtually every finding and conclusion reached by the trial judge after extensive hearings and multiple carefully reasoned opinions. Because the trial judge in this case did not err, we affirm.

BACKGROUND

To understand where we are now in this case requires a short journey into where this case has been since it was filed in 1995. The basic case is typical of these Winstar-related lawsuits, with the plaintiff bank's claim having two central thrusts. First, it is alleged that the Government is liable for breach of contract. Government regulators urged the then-healthy bank to help out in the nation's S&L crisis of the 1980s by acquiring one or more failing thrifts, even though that might mean the rescuing bank would itself develop a negative capital position. In exchange, the regulators promised that the bank could carry a book entry, called supervisory goodwill, that would count toward the bank's minimum regulatory capital requirement and thus avoid regulatory purgatory. When the enforcement of FIRREA undid that promise, the Government breached its contract with the bank. Second, as a result of that breach, the once-healthy bank sustained serious losses in its attempt to meet the new regulatory

---

[4]     United States v. Winstar Corp., 518 U.S. 839 (1996).
[5]     There indeed is a tail on this tale—the Government's brief reports that there are still some twenty-six remaining cases in dispute that have been designated as Winstar-related cases.

requirements. The banks and their lawyers and accountants in this and other Winstar cases were most creative in finding multiple losses based on many damages theories.

In its first substantive ruling in this case, the trial court denied motions by both parties for summary judgment on liability.[6] The trial court thereafter granted the Government's motion for reconsideration to address an issue the trial court had deemed abandoned in its first decision. In that second ruling, the trial court concluded that a Government regulatory agency, the Federal Home Loan Bank of Cincinnati ("FHLB-Cincinnati"), possessed implied actual authority to bind the Government to the claimed contract.[7]

Later, the trial court granted the Government's motion for summary judgment as to certain categories of damages sought by Fifth Third.[8] First, the trial court rejected the Bank's claim for expectancy damages in the form of profits that Citizens would have received in the absence of the breach by leveraging goodwill in order to make more loans and investments. Because Fifth Third failed to identify specific investment opportunities, said the trial court, the lost profits claim was too speculative and unforeseeable.

The trial court also granted summary judgment against Fifth Third on its claim for an alternative form of expectancy damages under the doctrine of cover. Under this theory, Fifth Third would have calculated the hypothetical cost of replacing goodwill with tangible capital in the form of preferred stock. The trial court rejected this claim as

---

[6] Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 264 (2002) ("Fifth Third I").

[7] Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 637 (2002) ("Fifth Third II").

[8] Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223 (2003) ("Fifth Third IV").

speculative and unrealistic because at the time Citizens was a mutual association and could not have issued stock without converting to a stock corporation.

In addition, Fifth Third sought restitution damages based on either the net liabilities assumed by Citizens or the Government's actual historic cost in dealing with failing thrifts. The trial court ruled on summary judgment that the first method was contrary to established law and that the second lacked a basis in reality. Alternatively, Fifth Third asked for reliance damages based on the liabilities assumed by Citizens, a model also rejected by the trial court as contrary to established law.

Finally, Fifth Third requested what it referred to as "incidental damages," which in reality were another form of expectancy damages. Fifth Third alleged that if Citizens had not been forced to sell its Cincinnati branches to Banc One in 1991 due to the breach caused by FIRREA, it would have received additional proceeds by selling them in 1998 when the remaining branches of Citizens were sold to Fifth Third, and the Cincinnati branches would have earned profits for Citizens in the intervening years.

Fifth Third further alleged that, as a result of the breach of contract caused by FIRREA, Citizens in January 1992 was forced by regulators to convert from a mutual to a stock company to achieve compliance with regulatory capital requirements. Fifth Third contended that, absent the breach, Citizens would not have converted until, at the earliest, August of 1993, when under more favorable market conditions it would have sold its stock at a higher price.

The trial court concluded that these claims for incidental damages did not suffer from the same speculative character as the other expectancy damages theories and,

denying the Government's motion for summary judgment with regard to these claims, allowed them to go forward.

The case proceeded to trial on the questions of liability and damages. At the close of Fifth Third's case-in-chief, the Government moved for judgment on partial findings on both issues pursuant to Court of Federal Claims Rule 52(c). While the trial court denied the motion with respect to damages, the court granted the motion with respect to liability.[9]

The issue regarding liability was whether, at the Government's urging, Citizens in acquiring four failing thrifts between 1982 and 1985 had relied on a promise from the Government that it would have the supervisory goodwill accounting method to keep itself in regulatory compliance over the years, despite the book deficits the acquisitions caused. In short, was there a binding contractual promise by the Government which was breached by the enactment of FIRREA, the enforcement of which denied the long-term use of that accounting method?

Much of the evidence at trial regarding liability was based on witnesses' recollections, with oral and deposition testimony describing the communications between Citizens and FHLB-Cincinnati that led to Citizens' acquisition of the failing thrifts. There was testimony that both parties believed they had entered into a contract concerning the special accounting treatment of supervisory goodwill. The somewhat sparse written documentation was consistent with this understanding.

The trial court, however, was concerned that the witnesses' testimony seemed to be rote in nature and that the written evidence supporting the testimony was contained

---

[9] Fifth Third Bank of W. Ohio v. United States, 56 Fed. Cl. 668 (2003) ("Fifth Third VI").

in what the court described as routine agency documents. Based on its consideration of the evidence, the trial court concluded that the parties had not formed a contractual relationship.

When the case was appealed to this court, we reversed the trial court's ruling on liability.[10] We concluded that, when viewed in the light of the regulatory and economic context in which the parties negotiated and in which their understandings were reached, the evidence was sufficient to establish that the parties created contractual obligations which included the extended amortization of supervisory goodwill and the counting of supervisory goodwill as an asset for capital compliance purposes. We therefore held that the Government was liable for breach of contract as a result of the enactment and enforcement of FIRREA.

We addressed two additional issues on appeal. First, we agreed with the trial court that FHLB-Cincinnati had actual authority to bind the Government to a contract involving supervisory goodwill. We also affirmed the trial court's ruling on summary judgment barring Fifth Third's cover damages claim as speculative because it was based entirely on hypothetical costs of issuing preferred stock, and unrealistic because at the time Citizens was a mutual organization and could not issue stock. The case was remanded to the trial court for a determination of damages, if any, to be awarded.

A second trial took place in early 2006, now eleven years after the original complaint was filed. The trial resumed where the first trial ended, i.e., with the Government's case-in-chief, followed by Fifth Third's rebuttal. Because all of Fifth

---

[10]    Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221 (Fed. Cir. 2005) ("Fifth Third VIII").

Third's other damages theories had been precluded by the earlier rulings, the trial focused on the claim for incidental damages.

As noted earlier, the claim for incidental damages was based on two specific events that occurred in the early 1990s, shortly after the enactment of FIRREA. They involved, first, the sale by Citizens of its branches in Cincinnati, and second, a conversion of Citizens' ownership from mutual form to stock form. Both events were the result of a capital plan agreed upon by Citizens and the Office of Thrift Supervision, a government agency established by FIRREA as the primary thrift regulator. The purpose of the plan was to restore Citizens to profitability and to compliance with the federal minimum regulatory capital requirements imposed by FIRREA.

The dispute that Fifth Third and the Government are now engaged in is whether these events—the Cincinnati branch sale and the mutual-to-stock conversion—were caused by the Government's breach of the promises earlier made by the Government regulators regarding accounting of supervisory goodwill, and, if so, how any damages should be measured. Fifth Third's position is that the sale and conversion would have occurred, if they occurred at all, at a time of Citizens' own choosing when market conditions were favorable, rather than at the times imposed upon the bank by the regulators in response to the requirements of FIRREA. Having been forced to sell the Cincinnati branches and convert from a mutual to a stock organization prematurely, Citizens allegedly suffered substantial losses in the form of reduced proceeds and other lost profits.

After trial on these issues, the trial court published a 45-page opinion with extensive findings of fact and a thorough legal analysis of Fifth Third's damages claims.

The court awarded Fifth Third substantial damages for the losses sustained by Citizens, including about $8.5 million for lost profits from the sale of the Cincinnati division (after certain adjustments) and about $44.2 million for premature conversion. Following an adjustment to compensate for the taxes Fifth Third will owe on the premature conversion damages, the total damages award came to about $76.5 million, which, as the trial court noted, is a relatively modest sum in the context of Winstar litigation.

The Government appeals the entire damages award. Fifth Third cross-appeals the trial court's denial of a portion of its claim related to the sale of the Cincinnati division. We have jurisdiction over the appeal under 28 U.S.C. § 1295(a)(3).

DISCUSSION

A. Overview

Expectancy damages are intended to make a non-breaching party whole by providing the benefits expected to be received had the breach not occurred. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 344(a) (1981)). Expectancy damages include lost profits but are not limited to them. Id. As a general proposition, a party is entitled to expectancy damages if the party satisfies three requirements. First, the party must show that the claimed damages were within the realm of reasonable foreseeability at the time the contract was entered into (the foreseeability requirement). Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005). Second, the party must establish that the damages would not have occurred but for the breach (the causation requirement). Id. Third, "the measure of damages must be reasonably certain,

although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery'" (the proof of damages to a reasonable certainty requirement). Id. (quoting Glendale Fed. Bank v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004)).

In the Winstar litigation context, foreseeability, causation, and proof of damages to a reasonable certainty are all issues of fact that we review for clear error. Home Sav. of Am., FSB v. United States, 399 F.3d 1341, 1347 (Fed. Cir. 2005).[11] Clear error is among the more deferential standards an appellate court applies to the work of a trial court—a finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). In the case before us, the liability issues were settled by our prior opinion. The damages issues, to the extent there are questions about the applicable rules, fall within the well-established principles of our prior cases. The only issues then on appeal are whether the trial court in its extensive and thorough fact findings and conclusions committed clear error. Given the deference we grant to trial courts in their fact-finding role, this is a heavy burden for the Government to carry.

## B. Causation

We examine first the Government's arguments regarding causation. The Government argued at trial that several factors other than FIRREA, such as alleged

---

[11]    But cf. Home Sav. of Am., 399 F.3d at 1347 (suggesting that we review the trial court's methodology for calculating damages for abuse of discretion). Since in most respects the clear error and abuse of discretion standards are similarly deferential, we need not try in this case to separate the applied methodology from the process of fact-finding.

mismanagement of the thrift and overall lack of profitability, led to Citizens' actions and the times they were taken, and that in any event the regulatory pressure to raise capital and downsize would have been the same absent the breach. The trial court disagreed, finding that Citizens would not have sold the Cincinnati division in 1991 or converted to stock form in January 1992 but for the breach caused by FIRREA. Fifth Third IX, 71 Fed. Cl. at 87-90.

On appeal, the Government asserts that the trial court erred in concluding that regulators would not have been concerned with Citizens' level of tangible capital even in the absence of the breach, and would not have required Citizens to take steps to recapitalize or downsize when they did. Recreating the past—who thought what, when, and why—is quintessentially a question of fact. Though, as in most fact-based trials, one could read the evidence different ways and reach different conclusions, the trial court's findings are supported by ample evidence, including the contemporaneous circumstances, documentation, and witness testimony expressly credited by the trial judge. On this record there is clearly no basis on which we could say that the trial court committed clear error in its finding of but-for causation.

## C. Foreseeability

The trial court found that the damages caused by the sale of the Cincinnati branches and the reduced conversion damages were reasonably foreseeable at the time of the contract, based on the following analysis. Id. at 88-90. First, the court found that a prudent regulator would have been aware that removal of supervisory goodwill would cause Citizens to become capital deficient, which would require Citizens to raise capital to comply with capital requirements. The court found that a prudent regulator

would have known that the principal ways of raising capital were sales of assets and conversion of ownership to stock form, and would have understood that the timing of these actions could affect the amount of proceeds received. Thus, the trial court concluded, a prudent regulator would have foreseen that a breach of the accounting method promise and the consequences thereof would take away Citizens' ability to choose the timing of its sale of the Cincinnati division and its conversion to stock form, and that this could cause damages. Furthermore, the trial court found that the regulators in this case actually knew what would happen if the Government breached its contract, and therefore actual foresight existed.

The Government contends that damages based on the 1991 sale of the Cincinnati branches were not reasonably foreseeable because the higher deposit premium[12] Citizens was able to obtain in 1998 was due to an improvement in the economy, an event that was unforeseeable at the time of the contract. Similarly, the Government argues that the damages resulting from the reduced conversion proceeds were not reasonably foreseeable at the time of the contract because the calculation of reduced proceeds was based on the increase in the thrift stock price market index between January 1992 and August 1993. In the Government's view, regulators could not have foreseen that the conversion market would improve during that time period.

At times the Government couches this argument in terms of proximate causation—the damages were caused by changed economic conditions and thus were

---

[12] In a branch sale, the seller theoretically gives the buyer the branch's deposit liabilities (e.g., savings accounts) and an amount of cash equal to these liabilities. However, depending on the negotiated value of the liabilities, the buyer may agree to take something less than the full amount of cash. In that case, the difference is the deposit premium.

not proximately caused by the breach. Since both arguments relate to the ability of the Government to contemplate at the time of the contract the nature of Citizens' injuries, we will address both in terms of foreseeability. See Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006) ("Because these two doctrines are not meaningfully distinct, at least in the context of the case before us, we analyze them under the rubric of foreseeability.").

The trial court did not clearly err in concluding that the damages in this case were foreseeable. The trial court's basic findings, supported by the record and unchallenged by the Government, are sufficient to show foreseeability. Fifth Third was not required to demonstrate that the Government could have foreseen at the time of contracting that the market conditions might be less than favorable when it later breached the contract. We recently rejected a similar argument in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007). In that case, we affirmed the trial court's finding that the plaintiff was entitled to compensation for the negative tax consequences incurred in raising capital to replace lost goodwill. Id. at 1321. We held that the plaintiff was not required to prove that the tax consequences were foreseeable; all that was necessary was a showing that the need to raise capital in the event of a breach was foreseeable. Id. ("If it was foreseeable that the breach would cause the other party to obtain additional capital, there is no requirement that the particular method used to raise that capital or its consequences also be foreseeable."). Fifth Third has made that showing here and is not required also to show that the precise economic conditions at the time regulators forced Citizens to raise capital were foreseeable.

As the trial court correctly held, <u>Old Stone</u> does not support the Government's cause. The plaintiff bank in that case was forced to raise capital after FIRREA by selling assets, and we affirmed the trial court's award of damages associated with that activity. 450 F.3d at 1367-70. But the bank had other problems unrelated to the loss of goodwill and was eventually seized. The trial court awarded damages related to the seizure; we reversed that award because the seizure was not a foreseeable result of the breach. <u>Id.</u> at 1376. We explained that for the seizure to be foreseeable, a number of specific facts had to be established. <u>Id.</u> Based on the lack of evidence in the record, we concluded that the bank had failed to prove that the extended chain of causation was foreseeable. <u>Id.</u> Here, in contrast, Fifth Third is not claiming damages due to a seizure or other comparable event far removed from the breach; the damages compensate directly for the steps taken by Citizens to achieve regulatory compliance in the wake of FIRREA. <u>See also</u> <u>Citizens</u>, 474 F.3d at 1321-22 (distinguishing <u>Old Stone</u> on similar grounds).

The Government's reliance on <u>Estate of Berg v. United States</u>, 687 F.2d 377 (Ct. Cl. 1982), is also misplaced. That case is not about foreseeability or proximate causation at all, but instead deals with the proper time for measuring damages. Moreover, it does not stand for the proposition that an upswing in the market value of an asset following a breach is irrelevant to the damages caused by the breach. The court in <u>Berg</u> noted two general rules. First, the goal of expectancy damages is to place the injured party in as good a position as he would have been had the breaching party performed the contract. <u>Id.</u> at 379; <u>see also</u> Restatement (Second) of Contracts § 344(a) (1981). Second, the proper date for measuring damages is usually the date of

the breach.  <u>Berg</u>, 687 F.2d at 380.  In <u>Berg</u>, the plaintiff was made whole by valuing the bonds at issue as of the date of the breach; calculating the bonds' fair market value as of the later date urged by the Government would have reduced the damages award and would not have fully compensated the plaintiff for the Government's breach.  <u>Id.</u>

In some cases, however, strict application of the second rule may not result in the most accurate assessment of expectancy damages.  <u>See</u> <u>Energy Capital Corp. v. United States</u>, 302 F.3d 1314, 1330 (Fed. Cir. 2002) ("That rule does not apply, however, to anticipated profits or to other expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract.").  A court may consider post-breach evidence when determining damages in order to place the non-breaching party in as good a position as he would have been had the contract been performed.  <u>See</u> <u>id.</u>; <u>Castle v. United States</u>, 48 Fed. Cl. 187, 207 n.16 (2000), <u>aff'd in part, rev'd in part on other grounds</u>, 301 F.3d 1328 (Fed. Cir. 2002); <u>see also</u> Restatement (Second) of Contracts § 352 cmt. b, illus. 6 (1981) (using post-breach evidence to establish lost profits).  Here the trial court found that, but for the breach, Citizens would have sold the Cincinnati division in 1998 rather than 1991, and converted to stock ownership in August 1993 rather than January 1992.  Therefore it was appropriate, and certainly not clear error, for the court to consider the improved markets for conversion and branch sales in order to compensate Citizens for the damage sustained.

## D. Proof of Damages

### 1. Damages Related to the Sale of the Cincinnati Division

For calculating the damages associated with the forced sale of the Cincinnati division, Fifth Third's expert, Dr. Brumbaugh, created a model that restored to Citizens the assets that had been transferred to Banc One in 1991 as well as additional assets to account for the loss of deposits caused by the breach, for a total of $400 million in assets associated with the Cincinnati division. Fifth Third IX, 71 Fed. Cl. at 77-78. Next he divided the damages calculation into two parts. The first was a calculation of lost operating profits on the restored Cincinnati assets for the period between 1992 and 1998. Based on Citizens' actual return on assets for that time period with certain adjustments, he calculated lost profits of approximately $10.5 million. Id. at 78-79. The second part of the damages calculation assumed that the Cincinnati division would have been sold in 1998 to Fifth Third when the other Citizens branches were sold. Conservatively using a 7% deposit premium, which was somewhat lower than the average deposit premium Citizens actually received in the 1998 sale, Dr. Brumbaugh calculated that the proceeds from selling the Cincinnati branches in 1998 would have been $11.1 million greater than the proceeds of the sale to Banc One in 1991. Id. at 79-80.

The trial court awarded Fifth Third damages for the lost profits Citizens would have made on the sale of the Cincinnati branches in 1998 but not for the lost operating profits from 1992 to 1998. The trial court found that, though lost profit claims are often not susceptible to proof due to their speculative nature, this claim for lost profits on the sale of the Cincinnati division was based on a specific investment opportunity—Citizens'

1998 sale of assets to Fifth Third. The court concluded that these damages had been proven to a reasonable certainty. Id. at 90-91.

In contrast, the trial court determined that Fifth Third's claim for lost operating profits for the Cincinnati division had not been established to a reasonable certainty. Fifth Third's model applied a hypothetical rate of return on assets to the restored Cincinnati asset base. The trial court found that this method was too speculative because there is no evidence that the thrift's expanded asset base, including the Cincinnati assets, would have realized profits at a similar rate to the thrift's actual profits during that period. Id. at 91.

On appeal, the Government challenges the award based on the 1998 branch sale on the grounds that it was based on a hypothetical transaction, and thus is too speculative. There are two flaws in the Government's argument. First, although we have noted that damages claims based on hypothetical events often are difficult to prove, they are not barred as a matter of law. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1381-83 (Fed. Cir. 2005); Fifth Third VIII, 402 F.3d at 1236-37; Glendale, 378 F.3d at 1313. Second, the Cincinnati division award was not entirely hypothetical since it relied on two *actual* transactions—the 1991 sale of the Cincinnati branches to Banc One and the 1998 sale of the remaining branches to Fifth Third, albeit without the Cincinnati division. We see no clear error in the trial court's finding that the award was established to a reasonable certainty, which the record fully supports.

In its cross-appeal, Fifth Third argues that the trial court erred in rejecting its claim for lost operating profits of the Cincinnati division between 1992 and 1998. It first asserts legal error, alleging that the trial court incorrectly applied the "reasonable

certainty" standard to the *amount* of damages, rather than just to the *fact* that damages occurred. We agree with Fifth Third that some courts, including this one, have interpreted the "reasonable certainty" standard to apply only to the *fact* of damages, after which the court may "make a fair and reasonable approximation of the damages." Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001) (quoting Locke v. United States, 283 F.2d 521, 524 (Ct. Cl. 1960)); see also 1 Robert L. Dunn, Recovery of Damages for Lost Profits § 1.8 (6th ed. 2005) ("While the proof of the *fact* of damages must be certain, proof of the *amount* may be an estimate, uncertain or inexact."). Nevertheless, we do not understand the trial court's decision as having misapplied that standard when the court found that the claim for lost operating profits from 1992 to 1998 was not established. Rather, the opinion can be fairly read as finding it was not reasonably certain that the Cincinnati assets would have earned profits during the entire period in question.

Fifth Third also argues that the trial court made a factual error by assuming that Citizens invested its funds separately by division, as indicated by the court's reference to a "Dayton" rate of return, Fifth Third IX, 71 Fed. Cl. at 78-79, 91, when in fact the thrift's assets were pooled for investment purposes. It appears, however, that for at least part of the 1992-1998 time period, Citizens consisted of only a Dayton division, so the rate of return on pooled assets was indeed a Dayton rate of return for some of those years.[13] Thus it is not clear that the trial court made an erroneous assumption.

---

[13] Citizens sold its Columbus division in 1990 and its Cincinnati division in 1991, leaving only the Dayton division. Cross-Appellant's Reply Br. 10. Citizens reentered the Cincinnati market by acquiring twelve branches from two banks in 1995. Id.

What is evident is that the trial court rejected the notion that the bank's expanded asset base (which would have included the Cincinnati branches in the absence of the breach) would have realized profits at a rate similar to that of the actual bank's profits. The trial court found that determining hypothetical Cincinnati profits in the absence of the breach was too speculative an endeavor to result in a reasonable approximation of lost profits damages. The record supports that finding, and we are unconvinced that the trial court committed clear error in holding against Fifth Third's claim for lost operating profits in this context.

2. Damages Related to the Mutual-to-Stock Conversion

Fifth Third's other damages claim related to its conversion from mutual to stock form. Its expert testified that absent the breach Citizens would have converted in August 1993 because that was the first date when the three conditions set out by Citizens' management for conversion were satisfied. He then calculated the damages as the difference between the proceeds that would have resulted from a hypothetical conversion in August 1993 and those received when Citizens converted in January 1992. His results ranged from about $30 million to about $47 million, depending on whether the Cincinnati division was restored, and, if so, whether its operating profits were also restored.

The Government argued before the trial court that no damages were sustained as a result of the conversion in January 1992 because the conversion was successful. In addition, the Government's outside experts were of the view that conversion proceeds were a liability that had to be paid back to the shareholders, similar to a loan. Thus, the Government argued, damages could only result from the loss of investment

opportunities due to the lesser equity raised from the conversion. Because Fifth Third had not identified any clearly defined investment opportunities that Citizens had foregone, the Government believed there were no damages from reduced conversion proceeds.

Fifth Third responded that the sale of stock was analogous to a sale of property, not a loan, a view of the transaction with which the trial court agreed. Id. at 75-77, 92-94. Fifth Third's expert testified that generally corporations have no obligation to pay dividends or for that matter repurchase shares. More specifically, Citizens' conversion prospectus for the sale of its stock did not mention a requirement to pay dividends, or any other liability or debt to the shareholders. The trial court therefore found that the sale of stock at the conversion of ownership form had the characteristics of equity, not of debt. Thus the court treated the sale of stock like the sale of property and concluded that reduced conversion proceeds were a proper measure of damages. Accepting the model that assumed the Cincinnati division had been restored before the conversion, but without the division's hypothetical operating profits, the trial court awarded approximately $44.2 million in damages for lost conversion proceeds. Id. at 93-94.

On appeal, the Government repeats many of the arguments it made below. Its first argument—that reduced conversion proceeds are too speculative—is unpersuasive, just as it was unpersuasive with respect to the damages for the sale of the Cincinnati division. Unlike some damages claims that we have rejected previously, see, e.g., Fifth Third VIII, 402 F.3d at 1237 (affirming trial court's conclusion that cover damages claim based on hypothetical costs of issuing preferred stock was too speculative), this claim does not depend only on a hypothetical capital-raising

transaction. Instead, Citizens actually converted in January 1992, and the trial court specifically found that, absent the breach, Citizens would have converted in August 1993, a finding supported by the record and not challenged by the Government on appeal.

The heart of the Government's argument on appeal is that reduced conversion proceeds are not a proper measure of expectancy damages, and an award of these damages would result in a windfall to Fifth Third. The Government's position rests on the notion that investors who purchase stock have an expectation of repayment of their investment. Thus, the argument goes, the investors who would have provided the additional capital if Citizens had converted in August 1993 would have expected a return on their investment. If, instead, the Government provides the additional capital in the form of contract damages, the Government would have no expectation of repayment. Therefore Fifth Third will be in a better position with a damages award for breach of contract than it would have been had the contract been performed, a result not contemplated by the recovery principle of expectancy damages. The Government's conclusion, as was explained at the trial, is that the only damages to which Fifth Third might be entitled are the profits that would have been earned on the lost conversion proceeds, not the lost proceeds themselves.

The trial court heard extensive expert testimony from both sides and ultimately determined that Fifth Third's experts held the correct view of the transaction. We agree. In the first place, whether the investors who purchased the stock when Citizens converted expected a return on their investment is immaterial because they had no legally enforceable right of repayment. As the trial court found, there was no formal

obligation on the part of Citizens to pay dividends or to repurchase the shares. The conversion prospectus explicitly stated that Citizens would not issue an initial dividend, and it contained no guarantees of future dividends. The windfall theory does not hold air—we see no error in the trial court's conclusion that the proceeds Citizens lost by converting earlier than it would have in the absence of the breach were an appropriate measure of expectancy damages.

LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363 (Fed. Cir. 2003), cited by the Government, does not require a different result. In that case, the plaintiff bank sought as expectancy damages the costs associated with replacement capital it had raised after FIRREA to achieve capital compliance. Id. at 1374. We rejected the Government's argument that the capital had no cost and permitted the bank to claim the payment of dividends as cost-of-replacement-capital damages. Id. at 1375. There, however, the bank was trying to recoup as costs the dividends already paid out to shareholders. In contrast, the issue here is whether Citizens was required to repay its investors. The record does not support the Government's view that Citizens could not have retained the additional proceeds it would have received had it waited until August 1993 to convert. LaSalle Talman, therefore, does not help the Government.

The trial court also found that, even if reduced conversion proceeds were not an acceptable measure of damages, they are a "fair and reasonable approximation" of damages under the so-called jury verdict method. We need not address the Government's challenge to this alternative finding because we affirm the trial court's decision that the lost conversion proceeds were a suitable form of expectancy damages.

E.  Summary

We appreciate the trial court's patient, thorough, and exhaustive work in this long-running case, and we affirm the trial court in all respects.  For the record, we have considered the Government's other arguments and find them to be without merit.  These include the Government's contentions that Citizens was not injured at all by the premature conversion; that the conversion proceeds award should be offset by $22 million from an August 1993 subordinated debt offering; that the deposit premium award for the Cincinnati branches should be offset by profits earned on investment of the premium obtained in 1991; and that the lost conversion proceeds and Cincinnati lost profits awards are duplicative.

CONCLUSION

The judgment of the trial court is

AFFIRMED.