# United States Court of Appeals for the Federal Circuit

———————————

**SONOMA APARTMENT ASSOCIATES, A CALIFORNIA LIMITED PARTNERSHIP,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2018-1781

———————————

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00940-MMS, Chief Judge Margaret M. Sweeney.

———————————

Decided: September 23, 2019

———————————

DEBORAH S. BULL, Perry, Johnson, Anderson, Miller & Moskowitz LLP, Santa Rosa, CA, argued for plaintiff-appellee.

MATTHEW PAUL ROCHE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

———————————

Before NEWMAN, CHEN, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

Sonoma Apartment Associates contracted with the Government to construct low-income housing in exchange for a $1,261,080 loan under Section 515 of the Housing Act of 1949.  In 2010, Sonoma submitted a written request to prepay the balance of its loan.  The Government denied the request, and Sonoma filed for breach of contract.  The Court of Federal Claims awarded Sonoma expectancy damages of $4,223,328 and a tax gross-up award of $3,171,990.  The Government appeals the tax gross-up award.  Because the Court of Federal Claims clearly erred in using income from a single tax year to predict the future rates at which each partner would pay taxes, we vacate the tax gross-up award and remand for entry of judgment consistent with this opinion.

I

A.

Section 515 of the Housing Act of 1949, 42 U.S.C. § 1485, authorizes the Department of Agriculture, Farmers Home Administration[1] to loan money to non-profit entities to provide rental housing for elderly and low- and moderate-income individuals and families.  *See Franconia Assocs. v. United States*, 536 U.S. 129, 134 (2002).  To participate in the Section 515 program, borrowers must enter into a loan agreement with the Government specifying, among other things, the length of the loan and any rights to make prepayments.  *See id.* at 134–35.

---

[1]    The Farmers Home Administration is now known as the Rural Housing Service.  But because the Court of Federal Claims referred to the agency as the Farmers Home Administration, we follow suit in this appeal.

Concerned about the number of Section 515 borrowers choosing to prepay their loans, Congress amended the Housing Act in 1979 and 1980 by imposing prepayment limitations. These amendments prohibited the Farmers Home Administration from accepting prepayments for 15 to 20 years from the date of the loan. *See* Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101, 1134–35 (1979); Housing and Community Development Act of 1980, Pub. L. No. 96-399, 94 Stat. 1614, 1671–72 (1980); *see also Franconia Assocs.*, 536 U.S. at 135. These amendments, however, did not adequately reduce prepayment rates. Congress therefore enacted the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), Pub. L. No. 100-242, 101 Stat. 1877, and the Housing and Community Development Act of 1992 (HCDA), Pub. L. No. 102-550, 106 Stat. 3672, to further limit the circumstances under which borrowers could prepay their loans. *See Franconia Assocs.*, 536 U.S. at 136–37 & n.3.

In *Franconia Associates*, the Supreme Court determined that the ELIHPA and HCDA anticipatorily repudiated existing Section 515 contracts because they applied retroactively. *Id.* at 148. This anticipatory repudiation ripens into breach when the Government denies a given borrower's request to prepay the balance of its loan. *Id.*

B.

Sonoma is a limited partnership formed by Richard Gullotta and Richard Parasol to manage housing properties. At the time of formation, each partner owned a 2.5% general partnership interest and a 47.5% limited partnership interest. Mr. Parasol later sold his 47.5% limited partnership interest to a married couple. In 2009, the surviving spouse sold that interest in equal shares to the living trusts for each of Richard Gullotta's three children for $40,000.

On September 4, 1984, Sonoma entered into a Section 515 loan agreement with the Farmers Home

Administration. The Government agreed to loan Sonoma $1,261,080 to construct low-income apartment housing, and Sonoma agreed to pay back the loan in installments over a fifty-year period ending on October 27, 2035. As part of the agreement, Sonoma executed two promissory notes for the balance of the loan. The promissory notes provided that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower providing the loan is in a current status." Sonoma secured the promissory notes with a deed of trust requiring it to use the building for low-income apartment housing for 20 years. The 20-year term ended on October 27, 2005.

Sonoma submitted a written request to prepay the balance of its loan on November 5, 2010. The Government denied the request on January 3, 2011. Sonoma filed a complaint for breach of contract at the Court of Federal Claims on November 27, 2013.[2] Because the Government conceded liability for the breach, the case proceeded only on damages.

## C.

Sonoma included a claim for a "tax neutralization payment" to offset the negative tax consequences of a lump-sum damages award. The Government moved for partial summary judgment, arguing that Sonoma could not recover any such payment. The trial court denied the motion, concluding that Sonoma was "entitled to attempt to prove, at trial, that a lump-sum damages award would increase its overall tax liability beyond what it would have been had it received market rate rental income from the date that it sought to prepay the balance of its loan." *Sonoma*

---

[2]    Sonoma also asserted a takings claim. But the Court of Federal Claims dismissed that claim, and Sonoma does not challenge that decision on appeal.

*Apartment Assocs. v. United States*, 127 Fed. Cl. 721, 734 (2016).  The Government later moved *in limine* to exclude the testimony of Dr. Barry Ben-Zion, Sonoma's expert on the "tax neutralization payment."  The trial court denied the motion, reasoning that "any criticisms of Dr. Ben-Zion's work, if valid, can be brought out on cross-examination." J.A. 981.

Over the Government's objection, the court found Dr. Ben-Zion qualified as an expert "who could perform a damage calculation based on forensic economic concepts and who would opine on all of [Sonoma's] economic damages including tax neutralization." J.A. 27 n.14 (cleaned up).  Dr. Ben-Zion testified that he had calculated the tax gross-up by (1) comparing the taxes the partners would have paid if the Government had not breached with the taxes the partners would now pay on the property and the lump-sum damages award, and (2) "increas[ing] the resulting tax neutralization payment to account for the fact that it, too, will be subject to state and federal income tax." *Sonoma Apartment Assocs. v. United States*, 134 Fed. Cl. 90, 150 (2017).

Dr. Ben-Zion used 2015 income tax rates to estimate Sonoma's future tax liability.  And to determine the applicable tax bracket for each partner, he held constant the adjusted gross income each partner reported on his or her most recent federal income tax return.  Thus, Dr. Ben-Zion assumed that Richard Gullotta, then 72, and his wife would earn $415,220 per year from 2016 through 2035.[3] He similarly assumed that Mark Gullotta's household and Karen Gullotta Kass's household would earn $282,572 and $72,841 per year, respectively, from 2016 through 2035.

---

[3]    The trial court rejected the assumption that Richard Gullotta would receive income through 2035, well into his nineties.  It required Dr. Ben-Zion to update his calculations to account for Richard Gullotta's life expectancy.

And he assumed that Eric Gullotta and his wife would earn $12,585 per year from 2015[4] through 2035.[5]

The court determined that Sonoma "ha[d] established, by a preponderance of the evidence, both 'a reasonable probability' that it will suffer adverse tax consequences due to the government's breach of contract and the existence of sufficient evidence to allow for the 'fair and reasonable approximation' of those adverse tax consequences." *Sonoma Apartment Assocs.*, 134 Fed. Cl. at 150 (quoting first *Locke v. United States*, 283 F.3d 521, 524 (Ct. Cl. 1960), then *Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966)). In doing so, the court accepted Dr. Ben-Zion's projections for future incomes and tax rates, noting that his estimates were "no more speculative than" any other estimates and that conducting more research "would not have increased the certainty of his projections." J.A. 94, 96. The court ultimately awarded Sonoma a tax gross-up of $3,171,990.

The Government appeals the tax gross-up award. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

II

We review factual findings by the Court of Federal Claims for clear error and its legal conclusions de novo. *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1353 (Fed. Cir. 2006). Whether a party has proven damages to a reasonable certainty and whether the measure

---

[4]    Eric Gullotta's most recent federal tax return was from 2014. Dr. Ben-Zion thus used Eric Gullotta's adjusted gross income from 2014 in his calculations despite using adjusted gross income reported on 2015 tax return for the other partners.

[5]    The record contains no evidence on the income of Richard Parasol.

used to calculate damages was too speculative are questions of fact reviewed for clear error. *See Dairyland Power Co-op. v. United States*, 645 F.3d 1363, 1371 (Fed. Cir. 2011); *Fifth Third Bank v. United States*, 518 F.3d 1368, 1375 (Fed. Cir. 2008). A factual finding is clearly erroneous when we are "left with a definite and firm conviction that a mistake has been committed." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (cleaned up).

The Government argues that the Court of Federal Claims clearly erred in awarding a tax gross-up because Sonoma's calculations were based on the "erroneous assumption that the partners' taxable income and the tax rates applicable to Sonoma's partners' income would remain unchanged through 2035." Defendant-Appellant Br. 24. Sonoma counters that it provided a fair and reasonable approximation of the adverse tax consequences. Plaintiff-Appellee Br. 18. For the following reasons, we agree with the Government and vacate the trial court's award of a tax gross-up.[6]

## A.

A tax gross-up "is the name given to an increase in the damage award to offset the taxes that will be payable on the award." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1226 (10th Cir. 2007). It is designed to eliminate the negative tax consequences a plaintiff might suffer from receiving a lump-sum payment, which "will sometimes push a plaintiff into a higher tax bracket than he would have occupied had he received [the lost monies] incrementally over several years." *Clemens v. Centurylink Inc.*, 874 F.3d 1113, 1116 (9th Cir. 2017). By accounting for any increase

---

[6] Because the trial court clearly erred in calculating future income, we do not address whether the trial court clearly erred in assuming constant tax rates.

in tax burden, a tax gross-up ensures that the plaintiff is put in the same position he would have occupied absent breach, i.e., that he is made whole.

We first approved grossing up a lump-sum damages award to offset negative tax consequences in *Home Savings of America.* We determined that, when the award compensates a plaintiff for lost monies that would not have been taxable, a trial court may adjust the award to account for the tax implications of a lump-sum payment. *Home Sav. of Am. v. United States*, 399 F.3d 1341, 1356 (Fed. Cir. 2005). Because we compared lost monies that would not have been taxable to a lump-sum payment that would be taxable, we only estimated plaintiff's tax rate at the time of the lump-sum award. *Id.* But here, Sonoma must estimate each partner's future tax rates over multiple years.

None of our cases since *Home Savings of America* have considered the situation we face here: when and how to calculate a tax gross-up award where both the lost monies and the lump-sum payment would be taxable.[7] Nor have any of our sister circuits addressed this issue. In *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426 (3d Cir. 2009), for example, the Third Circuit affirmed a tax gross-up on an award of back pay and compensatory damages, both of which would have been taxable. *Id.* at 430. But *Eshelman* has limited value here. The tax gross-up in *Eshelman* compensated Ms. Eshelman for past losses for which the applicable tax rates and lost income were known. *Id.* at 442. Sonoma, however, must estimate future tax rates and income.

---

[7]    *Carabetta Enters., Inc. v. United States*, 482 F.3d 1360 (Fed. Cir. 2007) presented a similar situation, but we did not decide this issue because Carabetta had offered no evidence that the tax it would have paid on incremental earnings differed from the amount it would pay on a lump-sum damages award. *Id.* at 1367–68.

Absent precedent on this issue, we turn to the broader context of our damages case law to guide our analysis. We do not require "absolute exactness or mathematical precision" in the ascertainment of damages. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001). Our goal is to make the non-breaching party whole, so "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation" of the non-breaching party's damages. *Id.* (cleaned up). Thus, in *Bluebonnet Savings Bank*, we determined that the Court of Federal Claims had clearly erred in declining to award damages on the grounds that "the Deputy Counsel for CFSB was unable to fully explain the basis for all the costs set out" in its estimate. *Id.* at 1357. Because "the amounts owing under the SAREBA are directly spelled out in that contract and evidence was presented that the Memo Account was prepared in accordance with the SAREBA," we held that the estimate in the Memo Account "meets the reasonable certainty test and it is inappropriate to require CFSB to justify the basis for each term in the agreement." *Id.*

Yet it is not enough to merely assert entitlement to damages without offering evidence in support. *See id.* at 1358. Plaintiffs must provide *some* measure of substantiation to show the reasonableness of their calculations. In *Bluebonnet Savings Bank*, we found that "the Court of Federal Claims properly rejected Bluebonnet's claim for non-EBA damages." *Id.* We noted that Bluebonnet's calculations were based on "a speculative financing term of 13.5%" and that Bluebonnet had presented no evidence "that anyone would have loaned CFSB the funds required for the capital infusions at 13.5%." *Id.*

Similarly, in *Fifth Third Bank*, we approved the trial court's denial of Fifth Third Bank's claim for lost operating profits because Fifth Third Bank failed to show that the "bank's expanded asset base (which would have included the Cincinnati branches in the absence of the breach)

would have realized profits at a rate similar to that of the actual bank's profits." 518 F.3d at 1379. We reasoned that "determining hypothetical Cincinnati profits in the absence of the breach was too speculative an endeavor to result in a reasonable approximation of lost profits damages." *Id.* However, we rejected the Government's contention that a damages award based on a hypothetical sale was speculative. *Id.* We emphasized that the award "relied on two *actual* transactions—the 1991 sale of the Cincinnati branches to Banc One and the 1998 sale of the remaining branches to Fifth Third, albeit without the Cincinnati division." *Id.* at 1378 (emphasis in original).

## B.

Sonoma's only support for its proposed tax gross-up is the testimony of Dr. Ben-Zion. Dr. Ben-Zion used the income from each partner's most recent tax return to project future income, which in turn determined each partner's income tax bracket for future years.[8] The Court of Federal Claims accepted his calculations, finding "that projections

---

[8] We reject Sonoma's contention that income is irrelevant to the tax gross-up calculations. *See* Plaintiff-Appellee Br. 19–20, 43–45. Although the trial court instructed Sonoma to remove income from its wage estimates, each partner's projected tax rate was based in part on projected income, so income still factors into the calculations. Dr. Ben-Zion explained, for example, that "[s]ince we made a projection of what the income would have been in the future, *we had to take an assumption about what their income might be outside of Sonoma apartment*[], take the profits that Sonoma apartment were projected, divide them 50 percent to Richard Gullotta, 16 percent to each of the kids, *and added* [sic] *to their assumed otherwise income to estimate what their sequential tax would have been.*" J.A. 1535 (emphases added).

of future income based on current expectations are no more certain than projections of future income based on current income." J.A. 94. The court therefore concluded that it did not matter "whether Dr. Ben-Zion was obligated to investigate the partners' tax situation beyond reviewing their income tax returns" because such an investigation "would not have increased the certainty of his projections." J.A. 94.

The Court of Federal Claims clearly erred in awarding Sonoma a tax gross-up based on calculations that assumed each partner's income would remain constant for 20 years. To satisfy its burden of proof, Sonoma needed to show that its tax gross-up calculations fairly and reasonably approximated the damages it faced. *See Bluebonnet Sav. Bank*, 266 F.3d at 1358. And because its calculations held income constant, Sonoma needed to show that the adjusted gross income from each partner's most recent tax return fairly and reasonably approximated future income. Sonoma failed to make this showing.[9]

Dr. Ben-Zion provided two explanations for his decision to hold income constant: (1) future income is unknowable and (2) holding income constant produces an overly-conservative estimate.[10] Neither explanation, however,

---

[9]    To the extent that the Court of Federal Claims found it significant that other measures of future income would be "no more certain than" current income, it misunderstood Sonoma's burden of proof. Sonoma needed to show that it adequately estimated future income, *not* that its measure was no more speculative than any other measure.

[10]    Sonoma relies on this argument again on appeal. *See* Plaintiff-Appellee Br. at 46. We find it unpersuasive. The trial court rejected Dr. Ben-Zion's assumption that Richard Gullotta would continue to make $415,220 per year beyond his life-expectancy, which undercuts the notion that Dr. Ben-Zion made an overly-conservative

suggests that Dr. Ben-Zion's calculations fairly and reasonably approximated Sonoma's tax damages. Nor does the record remedy this gap. Sonoma provided no evidence to support Dr. Ben-Zion's assumption that each partner's income would remain unchanged and equal to his or her most recent tax return for the next 20 years. Dr. Ben-Zion did not question the partners about their future plans or expectations, nor did he discuss with any partner his or her most recent tax return. He thus did not account for the fact that Eric Gullotta had recently opened his own legal practice and had particularly high expenses in 2014 due to certain start-up costs. Those expenses, totaling $282,626, almost completely offset his gross income of $293,924.

Dr. Ben-Zion also did not explain why adjusted gross income from a single year was an adequate proxy for future income. Despite having access to multiple years of income data, he relied on only two pages from a single year's return to estimate the future income of each partner. And he used only one measure (adjusted gross income) to make his estimates, ignoring other relevant information from those pages (e.g., gross income and expenses). His calculations were premised on the accuracy of this single data point, but we cannot draw a line from one data point. Thus, like the plaintiff in *Bluebonnet* who proposed a "speculative financing term," Sonoma failed to provide adequate evidence to support a tax gross-up. *Bluebonnet Sav. Bank*, 266 F.3d at 1358; *cf. Fifth Third Bank*, 518 F.3d at 1378 (reversing the finding that an estimate based on "two *actual* transactions" was speculative). And although it did at least base its

---

estimate. And it is not clear in any event that overstating Richard Gullotta's income would adequately offset understating Eric Gullotta's (and possibly Karen Gullotta Kass's) household income for the next twenty years. *See* Plaintiff-Appellee Br. at 46. The record lacks any support for this assertion.

calculations on a figure in the record rather than a made-up estimate, Sonoma failed to show that this measure approximated damages any more accurately than the financing term proposed in *Bluebonnet*. *See Bluebonnet Sav. Bank*, 266 F.3d at 1358. The Court of Federal Claims therefore erred in awarding a tax gross-up based on Dr. Ben-Zion's calculations.

Sonoma argues that holding income from the most recent tax year constant was reasonable because courts have allowed Dr. Ben-Zion to make a similar assumption in other cases. Plaintiff-Appellee Br. at 47. But the courts explicitly instructed Dr. Ben-Zion to hold income constant in the referenced cases. And these cases typically involved Government employees subject to a specific pay scale, not self-employed individuals or employees working for private employers.

Sonoma also contends that the Government, as the breaching party, should bear the burden of imprecision. Plaintiff-Appellee Br. 30–33. While we recognize that the Government's breach created the circumstances under which we must now consider future income and tax rates, we decline to find that it absolves Sonoma of its burden of proof. Sonoma is the party seeking damages and thus "bear[s] the burden of showing an income-tax disparity and justifying any adjustment." *Clemens v. Centurylink Inc.*, 874 F.3d 1113, 1117 (9th Cir. 2017). It failed to offer enough evidence to meet that burden. We therefore must vacate the tax gross-up award.

## III

We have considered Sonoma's remaining arguments and find them unpersuasive. For the foregoing reasons, we conclude that the Court of Federal Claims committed clear error in using a single year of taxable income to predict the future rates at which each partner would pay taxes. Thus, we vacate the trial court's grant of a $3,171,990 gross-up on the expectancy damages award and remand to the Court

of Federal Claims to enter judgment consistent with this opinion.

**VACATED AND REMANDED**